**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

MALIK SINGER,                          :
                                       :
            Petitioner,                :          Civ. No. 19-12497 (GC)
                                       :
      v.                               :
                                       :
ATTORNEY GENERAL OF THE STATE  :          **OPINION**
OF NEW JERSEY, et al.,                 :
                                       :
            Respondents.               :

---

**CASTNER, District Judge**

### I.      INTRODUCTION

Petitioner, Malik Singer ("Petitioner" or "Singer"), is a state prisoner incarcerated at the

South Woods State Prison in Bridgeton, New Jersey.  He challenges his state criminal convictions

through a pending *pro se* amended petition for writ of habeas corpus pursuant to 28 U.S.C.  § 2254.

(*See* ECF 9).  For the reasons that follow, Petitioner's amended habeas petition is denied and a

certificate of appealability shall not issue.

### II.     FACTUAL AND PROCEDURAL BACKGROUND

A state jury convicted Petitioner of conspiracy to murder Michael Love as well as

conspiracy to murder three potential prosecution witnesses and three counts of conspiracy to

commit witness retaliation.  *See State v. Singer*, Dkt. No. A-4620-16T1, 2018 WL 5074171, at *3

(N.J. Sup. Ct. App. Div. Oct. 18, 2018).  There jury hung though on whether Petitioner murdered

Love and on whether Petitioner possessed a handgun for an unlawful purpose.  The New Jersey

Superior Court, Appellate Division outlined the extensive factual background giving rise to

Petitioner's criminal convictions on direct appeal as follows:

> At approximately 7:30 a.m. on May 11, 2008, Keith Crandle, the manager of the social club "Ten's Enough" in Franklin Township, discovered the body of Michael Love just outside in the club's smoking area. At first Crandle did not know if Love was dead, sleeping, or intoxicated; after confirming that Love was dead, Crandle called the Franklin Police Department and the owners of the club. He remained at the scene until the police officers arrived.
>
> Detectives Anthony Bisignano and Jolanda Lacewell, of the Franklin Township Police Department, and Detectives Jeffrey Scozzafava and Robert Flanigan of the Somerset County Prosecutor's Office, responded to the crime scene. Scozzafava and Flanigan, who were in the Forensic Unit, processed the scene, which included conducting fixed point measurements, collecting evidence, taking photographs, and videotaping the scene. Based on witness interviews and an inquiry sent to area law enforcement agencies, Bisignano received information regarding a "James Miller," and an individual with a street name or alias of "Face," as possible suspects in the murder. The man known as "Face" was described as "a thin black male with a teardrop tattoo under each eye."
>
> Lieutenant Christopher Shea, of the Somerset County Prosecutor's Office, was the supervisor of the detectives involved in the homicide investigation and was also personally involved in the investigation. The individuals suspected of having some involvement with Love's death were believed to have used a particular cell phone. The Prosecutor's Office obtained a communication data warrant (CDW) to "ping the cell phone, which basically is giving [the detectives] the location of where that cell phone is." The pinged phone identified Stamford, Connecticut as the cell phone's location. The investigation revealed defendant was using the cell phone, and that it belonged to Ann Marie Pettigrew, whom investigators believed was associated with Sa'id Kendrick.
>
> On May 12, 2008, Detective Sergeant Lewis DeMeo, of the Somerset County Prosecutor's Office, Major Crimes Unit, and other police officers, drove to Stamford, Connecticut to follow up on cell phone information indicating someone named "Face" was at this location. With the assistance of Stamford Police Officers, Sergeant DeMeo and the other New Jersey officers were able to refine their electronic search to a particular address where the phone was located.

A woman opened the door of this apartment.  When asked whether she was white, DeMeo described her as "Hispanic."  [FN 2]  After identifying themselves as police officers, they told her they were looking for an "African–American male" whom they believed was in the apartment.  The woman invited the officers to "come in." According to DeMeo, they walked in and towards the back of the apartment where the door "was opened a little bit."  The officers found Kendrick, his girlfriend, and his cousin, James Spurgeon, in the back bedroom.  DeMeo testified that as soon as they announced themselves as police officers, Kendrick "jumped up out of bed, [and] made a move to a backpack."  The officers tackled Kendrick to the ground and handcuffed him.  Before opening the backpack DeMeo saw "a pair of shoes and what looked like the butt of a handgun." DeMeo retrieved a handgun from the backpack.

> [FN 2] We take this opportunity to point out that, "Hispanic is not a race.  It is a cultural term, an ethnic identification."  State v. Valentine, 345 N.J. Super. 490, 496 (App. Div. 2001), certif. denied, 171 N.J. 338 (2002).  As our colleague Judge Rodriguez made clear in Valentine, "Hispanics are of different races, i.e., African-American, Caucasian, Native-American, or Asian."  All of these races are represented among Hispanics living in the urban centers of this state.  A Hispanic person can also be of multi-racial descent."  Id. at 497.

During questioning by the officers in Connecticut, Kendrick denied he was the person called "Face," and claimed defendant was the one who used that street moniker.  Armed with this information, DeMeo and his investigative team returned to New Jersey.  On May 13, 2008, DeMeo and two other detectives staked out the home of Antoinette Michaels, the woman known to be the mother of defendant's child.  She resided in the Township of South Brunswick. At one point, DeMeo testified he saw "a Hispanic female driving a small grey car."  Sergeant DeMeo and Detective Bisignano also saw that "Malik Singer was in the passenger seat" of the vehicle.

The woman driver parked the car and defendant stepped out.  The detectives pulled up behind the vehicle, jumped out of their car with their guns drawn, and DeMeo yelled: "Face, get on the ground!" Defendant immediately "got down."  DeMeo testified that after he and Bisignano finished handcuffing him, defendant "kind of looked up because he was laying down on his stomach, [and said]: '*You homicide*'"?  (Emphasis added).  DeMeo noted in his testimony

before the jury that defendant asked this question before he and his fellow officers had made any references to their position in law enforcement or otherwise advised defendant that he was being arrested in connection with someone's death. Bisignano corroborated DeMeo's testimony in this respect. He testified the first words out of defendant's mouth were: "You homicide detectives, right?"

DeMeo thereafter told defendant he was being arrested in connection with "the shooting the other night." In the course of defense counsel's cross-examination, DeMeo read a section of the transcript of defendant's videotaped interview in which he twice denied that his nickname or "street name" is "Face." Defendant insisted people know him as "Mo" not "Face." DeMeo also testified defendant referred to himself as "Face" then retracted by claiming: "No, I fucked up. Listen no [sic] my name is 'Face,' everybody know [sic] me as Mo." DeMeo also indicated, through cross-examination, that defendant yelled out, "I didn't kill nobody." DeMeo testified that while waiting for other officers to arrive, "somebody" told defendant that James Miller and Sa'id Kendrick had both been arrested and that the police had found Kendrick in possession of a handgun in Connecticut. . . .

Somerset County Prosecutor Detective David Whipple and Franklin Detective Lacewell interrogated defendant after his arrest. The interrogation was video/audiotaped and transcribed. Lacewell testified that before they asked defendant any questions about Love's death, Whipple read defendant his rights under *Miranda* from a standard form. Defendant read the *Miranda* rights form himself and signed the waiver card; both Whipple and Lacewell signed the card as well. The record shows defendant signed the waiver form at 4:18 p.m. on May 13, 2008. The video/audiotape of defendant's statement was played to the jury.

Defendant denied shooting Love. He also denied being at the club "Ten's Enough" on the night of May 10 into 11, 2008, the evening Love was killed, claiming he was with his girlfriend and her friend at a hotel that evening. Although he admitted that he had possession of the murder weapon the night before the shooting, defendant stated he had returned the weapon to Kendrick prior to the shooting.

> DEFENDANT: Yeah at one point I did touch the gun when I flashed it, that's it.
> . . . .
> I gave it back to Sa'id [Kendrick]. I'm fucked either way.

> DETECTIVE WHIPPLE: Yeah.
> DEFENDANT: Cause (inaudible) on the shit know what I'm saying.
> DETECTIVE WHIPPLE: Yeah I know.
> DEFENDANT: I'm fucked I mean because I touched the gun.

Defendant also claimed Kendrick had confessed to him that he had shot and killed Love and that Kendrick's street name was "Face"; defendant insisted he was known as "Mo Betta Brim."

Fingerprint comparison analysis identified the victim as Michael E. Love. The jury also heard testimony from the State's fingerprint expert that the victim's fingerprint comparison was not based on criminal records. Dr. Thomas Blumenfeld, the medical examiner who conducted the autopsy on Love's body on May 12, 2008 and issued a report documenting his findings, died before the start of this trial. Dr. Roger Mitchell, Jr., a forensic pathologist and the "Medical Examiner for the northern region of New Jersey" testified at trial after he had reviewed Dr. Blumenfeld's autopsy report. Love suffered a gunshot entrance wound on the right side of his head at the eyebrow level. There was no exit wound. As Dr. Mitchell explained:

> The path of the bullet was front to back, right to left, and slightly downward after entering into the side of the head and entered into the skull, and penetrated the brain and brain stem causing damage and bleeding.
> Q. What is the effect, Doctor, in your . . . field of expertise, what is the effect of a bullet to the brainstem?
> A. Death.

The bullet was found in the skull cavity. It was undisputed the manner of death was homicide.

Acting on the State's application, the trial court admitted Edward Jachimowicz, a former supervisor of the Firearms and Tool Marks Section of the Connecticut Department of Public Safety's Science Laboratory, as an expert in firearms examination and tool marks. On May 12, 2008, he examined the Smith and Wesson revolver found in Kendrick's possession in Connecticut. Jachimowicz determined that the handgun was operable, and that its serial number was partially "obliterated." He fired six test shots from the handgun, preserving the fired bullets for subsequent comparison.

The trial court also admitted Detective Gary Mayer of the Somerset County Prosecutor's Office, Ballistics Unit, as a forensic ballistics expert. On May 13, 2008, he drove to Connecticut to collect the six "test shot" bullets fired from the revolver, and transported them to the Somerset County Prosecutor's Office's forensic ballistics laboratory. The next day, Mayer examined the bullet fragments removed from the victim at the autopsy and concluded they were what was left of a .357 magnum or .38 caliber bullet. He also compared those fragments with the six "test shot" bullets he recovered from Jachimowicz. Detective Mayer concluded there was a positive match, and that the bullet removed from Love's body was fired from the revolver the police seized from Kendrick.

Kendrick, who along with defendant and Miller, was also indicted as a codefendant for murdering Love, testified as a witness for the State. According to Kendrick, on Friday May 9, 2008 (the day before Love was killed), defendant was involved in a bar fight. Kendrick testified defendant was bloody coming out of the bar and asked to borrow his gun. Kendrick said he lent defendant a .38 caliber revolver. Kendrick testified that defendant took the handgun from him:

> He enters inside the bar. Maybe like two, three steps behind him. I open the door. When I open the door, everybody is on the ground. The yelling, screaming, people heading for the back door. I grab him by his shirt. Ask him what he's doing.
> Q. Where is the gun, Mr. Kendrick?
> A. The gun is pointed at everybody.
> Q. Whose got it?
> A. Mr. Singer.

Kendrick testified that he pulled defendant out of the bar and told him to leave. Kendrick was using his mother's cell phone that night; he let defendant use it to call for a ride, which came immediately. Kendrick saw a woman pull up in a gray or silver Honda Accord, with tinted windows; defendant stepped inside this car on the passenger's side and the woman drove away.

Miller, who was also indicted with defendant and Kendrick for the murder of Love, also testified as a witness for the State. He testified that his street name was "Brim." He had known defendant, whose street name was "Face," for years and identified him in open court. On May 9, 2008, Miller was inside Ten's Enough social club when he had an argument with Latoya Singleton (the mother of his son),

because she was drinking with a man at the club.  This man was Michael Love.

Singleton testified that she shared a couple of drinks with Love that night, and they "had one dance, probably less than three minutes long."  Love gave Singleton approximately $75 in cash and told her it was "a Mother's Day present [.]"  He said she should use the money to "treat herself."  Singleton gave the money to her friend Aisha Williams to hold because "I had a boyfriend, and I didn't seem it [sic] necessary to take male money, as I referred to it."  Stated differently, because she lived with "Brim," she did not want him to see her with "a wad of money and then be asking [her] questions about it."

Singleton testified as a State's witness.  She identified defendant in court as someone she knew of a "couple of months."  She knew him as "Mo Better," and said that she, Williams, Kimberly Simonson, and Miller arrived at Ten's Enough just after 11:00 p.m. on May 10, 2008.  She said Miller was using her cell phone throughout the night, and to her knowledge, any calls made on that phone on May 10 or 11, 2008, were made by Miller.  She was near the bar and heard one gunshot.  According to Singleton, Miller and Williams were outside at the time.

Williams corroborated most of Singleton's testimony.  She testified she was at the club that night with Singleton and Simonson.  Love, whom she had never seen before that night, sent them some drinks because Williams believed he was "kind of sweet on Toya [Singleton]."  Love had given Williams $80 or $90 for her to buy Singleton a gift for Mother's Day.  Williams testified Miller showed up and started yelling and accusing her that she had "his girlfriend at the bar lap dancing with some other guy."  Singleton denied she was "lap dancing" on Love, and claimed she was just dancing with him. This prompted an argument between Miller and Singleton.

Williams witnessed an argument between her friend Simonson and Simonson's boyfriend, Willie Pitts.  When Simonson and Pitts went outside, Williams followed them.  Once outside, she saw James Rice, Miller, and defendant; she also heard Rice tell defendant that he could not enter through the side door.  She then saw defendant standing behind Love.  "The next thing I know, the gun go [sic] off. I see [sic] the man's body jerk."  Williams testified she saw defendant holding a gun, pointing it at Love's head, and pulling the trigger.  She identified defendant in open court as the man she saw shoot Love that night.

Williams specifically noticed defendant's tear-drop tattoos; she had seen him at the club before that night. She testified defendant was wearing a black "hoodie." When asked whether she had any doubt that defendant was the man she saw shoot Love, Williams responded she was "[p]ositive. Positive" that defendant was the shooter. She estimated the shooting occurred "anywhere between a few minutes before 1 to about maybe 1:30 [a.m.]" on May 11, 2008.

In the afternoon on the next day, Williams met with the police officers who were investigating the shooting. She told the investigators what she had witnessed and said she heard more than one shot. She admitted, however, that her hearing could have been affected by a combination of the music and the noise and commotion after the gunshot. She was nevertheless positive she *saw* only one gunshot.

On that same day, May 12, 2008, Williams was shown a photographic array prepared by the police. She selected defendant's photograph as the one depicting the shooter. She testified she looked through the photographs and "pointed out the picture of the man that I saw commit the murder at Ten's Enough. I signed it." She was certain defendant was the man who "pulled that gun, shot that man and killed him."

Miller testified that on May 10, 2008, he went to the Ten's Enough club with Simonson, Williams (whom he described as "like a family member" to him), and Singleton. They arrived a little after 10:30 p.m. He wanted to take Singleton out because it was Mother's Day weekend. He also saw Simonson get into an argument with her boyfriend, Pitts. Williams got Miller involved in the argument and eventually they moved outside into the smoking area, but he went back inside the club after a short time.

Later that evening, Miller called defendant to come to the club for "security," "back-up." Simonson's argument with Pitts had escalated and Miller felt outnumbered. Because he had come to the club with three women, Miller thought Pitts was going to jump him. When defendant arrived, Miller was outside; he told defendant, "I would take care of Will[ie Pitts], back up Mr. Love." Miller noted Love was "the person that the night before supposedly that my baby mother [Singleton] was dancing with." Miller pointed out Love to defendant and told him to go after Love. According to Miller, he thought defendant was just going to fight Love; he denied knowing anything about a gun.

Miller claimed he was focused on Pitts, who was in front of him. Less than a minute later, "everybody hears a gunshot." Miller testified he did not see defendant after defendant went over to where Love was standing. Defendant was only at the club a few minutes before Miller heard the gunshot. Miller testified he agreed to plead guilty under a negotiated agreement with the State that included agreeing to testify against defendant in this trial. Under the plea agreement, the State dismissed the charge of first degree murder; the charge of first degree conspiracy to commit murder was reduced to conspiracy to commit aggravated assault; the prosecutor agreed to recommend a term of imprisonment not to exceed five years. According to Miller, as a result of the plea agreement, he was "marked" anywhere he went as "working with the State."

Kendrick testified that he drove to Ten's Enough on the evening of May 10, 2008, with his cousin, Spurgeon. He claimed he arrived at the club between 12:00 and 12:15 a.m., approximately ten to fifteen minutes before the shooting. He testified defendant was already there when he arrived. Contrary to Miller's testimony, Kendrick claims he did not get out of the car. He testified his cousin was the one who got out of the car and tried to get into the club through the side door. He testified he saw defendant shoot Love while he (Kendrick) was inside the car. "I seen [sic] the brown-skinned gentleman, he was on the telephone, he was speaking to someone. I don't know. I seen [sic] Mr. Singer. He stepped away slightly from Mr. Miller, then he raised his arm. I seen [sic] the firearm and I seen [sic] a light. I heard, I heard a single shot and I seen [sic] the gentleman fall." Kendrick was "positive" defendant shot the man.

Kendrick testified that immediately after the shooting, he saw Spurgeon come running out of the club into the parking lot; he also saw defendant run towards a Honda Accord, and pull off "[l]ike pretty fast." Before defendant left, however, he pulled up to Kendrick's car, and returned Kendrick's mother's cell phone, which Kendrick claims defendant had from the night before, and told Kendrick to call him. Later that day, Sunday, May 11, 2008, Kendrick met defendant at Johnson Park in New Brunswick. Defendant gave him a bookbag and told him to get rid of it. He testified that although he did not look in the bookbag, he knew the gun was inside. Despite this, he took possession of a bookbag he believed contained the handgun used to murder a man because he "wanted to help him out." He planned to go back to Connecticut and while on route, throw the gun off the George Washington Bridge. He got a ride to his house in Connecticut, where he was eventually arrested the following day in possession of the handgun.

Kendrick identified defendant in court as "Face." He claimed they were very close friends, "like [b]rothers." He nevertheless decided to testify against him because what was done "was wrong, and for a long time I tried to help him, tried to protect him, and I basically got to do what's right." He also explained that he decided to testify because he hoped his "cooperation" would result in time off his sentence as a co-defendant. He pleaded to conspiracy to commit murder with a sentencing recommendation not to exceed ten years imprisonment, with the further stipulation that he could serve his sentence in Connecticut. Finally, with respect to aliases or street-names, Kendrick testified he never heard defendant use the street moniker "Mo Better." As for himself, he has never used or been referred to as "Face."

James Rice was working security at the back door of the club on the night of the shooting. Rice described himself as a retired law enforcement officer. He had worked as a disc jockey at Ten's Enough in May 2008. He testified he stopped someone he had never seen before from entering the side door; he told that person he could not use the side door and that he had to go through the front door. He noticed the man had a teardrop tattoo under his eye. On May 12, 2008, a police officer showed Rice a photographic lineup; he identified defendant as the person he stopped from using the side entrance. He told the detective conducting the lineup, "I confronted him [and] told this person he couldn't come through the side door at Ten's Enough." Detective Richard Regan, of the Somerset County Prosecutor's Office, conducted a lineup for Rice. Regan testified Rice said "[t]his looks like him" when he selected defendant's picture. According to Regan, Rice did not say or do anything that indicated a lack of confidence in his choice. . .

The State called four witnesses who were or had been incarcerated at the Somerset County Jail during the time defendant was detained at this facility awaiting trial on these charges. These four inmates contacted the Somerset County Prosecutor's Office and offered to testify at defendant's trial concerning self-incriminating statements defendant allegedly made to them while he was incarcerated at the County Jail. Three out of four of these witnesses entered into plea agreements with the State that significantly reduced their penal exposure in exchange for testifying truthfully and completely about the statements allegedly made to them concerning his involvement in the killing of Michael Love. Only one of these four men testified he had not reached an explicit agreement with the State in exchange for his testimony. However, he hoped his cooperation and willingness to testify would be considered favorably by the court at the time of sentencing.

John Simpkins was incarcerated at the Somerset County Jail on the charge of robbery. He was housed "in the same pod" as defendant in the Somerset County Jail. He knew defendant before the two came to be detained in the same area of the jail. Simpkins testified at defendant's trial concerning an alleged conversation he had had with defendant about the reasons for his detention. According to Simpkins, defendant admitted to him he was involved in Love's murder. Defendant told him he had received a call from a friend named "Fat Boy" who was having a problem at a club. When he arrived at the club, "Fat Boy" pointed out Love as the person he was having a problem with that night. Simpkins testified defendant told him he snuck into the club and shot Love one time on the side of the head with a .38 caliber handgun.

According to Simpkins, defendant told him that after the shooting "he pretty much crept through the crowd without being noticed," and left the scene in "a car with tinted windows and two females." Defendant also allegedly told Simpkins about his plan for establishing an alibi. Defendant said that after the shooting, he "drove real fast to a gas station where he knew there was surveillance [cameras]," so that he could be taped there and "distance himself from [the crime scene]." Defendant also told Simpkins that he wore a black hoodie at the time of the shooting, but changed his clothes by the time he was caught on the gas station's surveillance camera. The next day, defendant gave his clothes and the gun to his friend "[t]o get rid of." Defendant told Simpkins that his friend failed to follow the instructions he gave him and ended up being arrested in Connecticut in possession of the handgun.

Simpkins claimed he contacted the prosecutor's office because he believed defendant's action in shooting Love was "senseless." Notwithstanding his alleged altruism, Simpkins negotiated a plea agreement with the prosecutor through which his original charge of first degree robbery was downgraded to third degree theft. Simpkins pled guilty to this reduced charge. Under the terms of the plea agreement, Simpkins agreed to testify truthfully about conversations he had had with defendant in which defendant allegedly made these self-incriminating admissions.

Marquis Smith was the second inmate from the Somerset County Jail who testified as a witness for the State. He was originally arrested for robbery and had been incarcerated since January 2009 awaiting a resolution of this charge. In October 2009, Smith's attorney contacted the prosecutor's office about his client giving a

statement concerning a murder involving defendant, Miller, and Kendrick.   Smith's statement and cooperation, however, were contingent upon reaching a favorable resolution of his robbery case. Smith negotiated an agreement with the prosecutor through which, in exchange for his truthful testimony and a guilty plea, his sentence would not exceed six years.  [FN 3]

> [FN 3] At this point, we pause to clarify that both Simpkins and Smith were charged with the crime of first degree robbery under N.J.S.A. 2C:15-1.   If convicted after a trial, they both could have been sentenced to a maximum term of twenty years, with an eighty-five percent period of parole ineligibility, and five years of parole supervision under NERA. N.J.S.A. 2C:43-7.2.  In Simpkins's case, the State amended the original charge to third degree theft under N.J.S.A. 2C:20-2, which carries a maximum sentence of five years without any mandatory period of parole ineligibility.  In Smith's case, although not explicitly stated in the record, we infer he agreed to plead to second degree robbery, thus reducing his penal exposure to a maximum of six years imprisonment, with an eighty-five percent period of parole ineligibility and three years of parole supervision, as required by NERA.

Smith testified he knew defendant's first name was Malik. However, Smith claimed defendant referred to himself as both "Face" and "Mo' Better."  According to Smith, he initially gave a false statement to the detectives from the prosecutor's office because he was "forced" to do so by defendant.  Smith claimed defendant had obtained both Smith's address and his family's address, and threatened to kill Smith and members of his family unless Smith told the detectives investigating the case a false statement.  Specifically, defendant told Smith to say he had not been involved in Love's murder, and that his street name was not "Face."  He also told Smith to say Kendrick had shot and killed Love.

However, shortly after he gave the detectives this allegedly false statement, Smith recanted.  He told the detectives the statement he had given was false.  Smith claimed he was scared for his life and the lives of his family members because defendant had threatened them both.  Smith told the detectives he was prepared to tell the truth about defendant's involvement in the murder of Michael Love. Smith then told the detectives he was detained in the same pod as defendant.   During this time, defendant told him he had been

arrested for a homicide at the Ten's Enough club in Franklin. Defendant also told him he had shot and killed Love with a .38 caliber revolver, after Miller pointed Love out to him.

Sonny Jackson was the third inmate called by the State. Jackson was incarcerated at the Somerset County Jail at the same time defendant was there awaiting trial. Jackson testified he had been arrested and charged with credit card fraud, which was subsequently "downgraded to theft," ordinarily a third degree offense. He met defendant while he was at the jail's "medical segregation unit." He testified defendant "was on the same floor as I, but he was about two cells from me." Jackson identified defendant at trial and testified defendant talked to him about the reasons he was in jail awaiting trial. Defendant allegedly admitted to Jackson that he shot and killed Michael Love over a "disagreement." Jackson subsequently contacted the prosecutor's office.

Jackson told the prosecutor that defendant asked him to contact and provide information to someone named "China." Jackson said defendant "wanted three witnesses taken care of, meaning killed, dealt with, or out of the picture in regards to making statements against him in his pending legal matters." The three potential prosecution witnesses defendant wanted "eliminated" were Yassim Cobbs, Marquis Smith, and Aisha Williams. Jackson told defendant he would deliver the message to China and help arrange with China to kill those three potential witnesses. Jackson testified he did not get "a deal" for his testimony; he testified because "it's the right thing to do, and I just don't agree with the facts of the matter."

Admir Hoornaert was the final "inmate witness" to testify for the State against defendant. He had arranged to buy marijuana from defendant on the night of the murder, May 10, 2008, at 10:00 p.m. Defendant did not show up; Hoornaert waited for defendant for about an hour and a half, then went home. Defendant called him later that evening at about 12:00 a.m., saying something had come up. He said he was still going to meet up with him "shortly," meaning within the next half hour or so; but defendant did not show up. Defendant eventually called him again at approximately 2:00 a.m., saying he was nearby in Manville. The two agreed to meet.

Hoornaert testified defendant showed up sometime between 2:00 and 2:15 a.m., in a gray Honda, with tinted windows. There were two women in the car with him. Hoornaert noticed what looked like blood, "like drops and clumps" of blood on defendant's left sleeve. Hoornaert testified defendant told him not to worry about it. Defendant got out of the car, lifted up his shirt, pulled out a gun and

said, "I need you to do me a favor"; "You got to keep this for me." Defendant said he would give him "an ounce right now" "if you hold this thing for a while." Hoornaert testified he told defendant he would not agree to hold the handgun. Defendant "got really pissed off" and called him a "pussy, [and a] faggot." Defendant then sold him the marijuana, slammed the car door and left.

Hoornaert next saw defendant in March 2009, when he was arrested for allegedly presenting forged documents. He was detained at the Somerset County Jail. His cell was next to "Face," whose real name he learned was Malik Singer. Defendant asked him if he remembered the night he had met him in Manville and sold him marijuana. According to Hoornaert, defendant told him "[w]e popped a guy over a bitch"; "The only problem was we popped the wrong guy." Defendant said that he had given the gun to this guy to get rid of it, but the "stupid ass" did not do that and got "popped with it."

According to Hoornaert, sometime thereafter, defendant began to act differently with respect to the reasons for his current incarceration. Hoornaert surmised defendant "started to realize that he had just said way too much already, and he started telling me that ... my name is not Face anymore ... [m]y name is Mo' Better. It's always been Mo' Better." Defendant also told him to make sure he told the police that he met him between 1:00 and 1:30 a.m., and to really emphasize the timing. Later on defendant changed his mind again and told him to "[f]orget about it," and that "it never happened."

Hoornaert had his attorney contact the prosecutor because he was afraid of possible retaliation from defendant. Hoornaert testified he feared being killed in jail. He told the jury he received "absolutely nothing" for his testimony in court. However, he remained hopeful he would receive some leniency for his cooperation.

*State v. Singer*, No. A-5270-11T4, 2014 WL 10213245, at *2-11 (N.J. Super. Ct. App. Div. Aug. 13, 2015) (footnote omitted).

Petitioner received a sentence of twenty-five years for conspiracy to commit murder. *See Singer*, 2018 WL 5074171, at *3. The trial court merged Petitioner's convictions on the three counts of conspiracy to commit witness retaliation with his convictions on the three counts of

conspiracy to murder witnesses and imposed a consecutive fifteen-year sentence to his twenty-five-year sentence for conspiracy to murder Love. *See id.*

Petitioner raised four arguments on direct appeal to the New Jersey Superior Court, Appellate Division. They were as follows:

1. The two-step question-first interrogation technique which was used in this case – where a defendant who is in custody is interrogated without *Miranda* warnings, and then the interrogation is repeated with warnings – clearly violated his right against self-incrimination.

2. Williams's identification of Petitioner as the shooter should have been suppressed because the identification procedure used was impermissibly suggestive and resulted in a substantial likelihood of irreparable misidentification.

3. The trial court erred in failing to instruct the jury on lesser included offenses for murder and conspiracy to commit murder and counsel was ineffective in arguing there was no basis for such instructions.

4. Petitioner's forty-year aggregate sentence was excessive.

The Appellate Division affirmed Petitioner's judgment of conviction on August 13, 2015. *See Singer*, 2014 WL 10213245. The New Jersey Supreme Court denied Petitioner's petition for certification. *See State v. Singer*, 129 A.3d 329 (N.J. 2016).

Petitioner then filed a petition for post-conviction relief ("PCR") with the New Jersey Superior Court, Law Division. In February 2017, the New Jersey Superior Court, Law Division denied Petitioner's PCR petition in a written decision. (*See* ECF 18-54). The New Jersey Superior Court, Appellate Division affirmed the denial of Petitioner's PCR petition on October 18, 2018 discussing some claims, but mostly summarily denying the remainder of Petitioner's claims. *See*

*Singer*, 2018 WL 5074171.   The New Jersey Supreme Court denied Petitioner's petition for certification on April 4, 2019.  *See State v. Singer*, 204 A.3d 897 (N.J. 2016).

Petitioner then initiated this federal habeas action.  (*See* ECF 1).  This matter was initially administratively terminated as Petitioner failed to file his habeas petition on the proper form.  (*See* ECF 4).  Ultimately, Petitioner filed an amended habeas petition on the proper form and this matter was reopened.  (*See* ECF 9 & 10).  Petitioner raises a plethora of claims in his amended habeas petition; which are as follows:

1.  The two-step interrogation technique which was used in this case – where a defendant who is in custody is interrogated without *Miranda* warnings, and then the interrogation is repeated with warnings – clearly violated Petitioner's state-law right against compelled self-incrimination as well as his Fifth Amendment right against self-incrimination ("Claim I");

2.  Williams' identification of Petitioner as the shooter should have been suppressed because the identification procedure was impermissibly suggestive and resulted in a very substantial likelihood of irreparable harm ("Claim II");

3.  The trial court erred by not instructing the jurors on lesser included offenses for murder and conspiracy to commit murder, and defense counsel was ineffective in arguing that there was no basis for such an instruction ("Claim III");

4.  Petitioner's aggregate sentence of forty years with an eighty-five percent period of parole ineligibility was manifestly excessive ("Claim IV");

5.  Petitioner's assertion of state and federal constitutional issues are not barred by New Jersey Court Rule 3:22 *et seq.* ("Claim V");

6. Trial counsel was ineffective for failing to do any investigation prior to trial and as a result failed to call witnesses ("Claim VI");

7. Petitioner's convictions are against the weight of the evidence ("Claim VII");

8. Ineffective assistance of appellate counsel in failing to argue that trial counsel was ineffective by not doing an adequate investigation and by failing to argue that the weight of the evidence was insufficient to convict ("Claim VIII");

9. Petitioner's arguments in his *pro se* PCR petition ("Claim IX");

10. Trial counsel was ineffective by failing to subpoena the following witnesses: (1) Chibuzo Chukunia; (2) Ann Marie Pettigrew; (3) James Spurgeon; (4) Nicole Davis; and (5) Will Pitts ("Claim X");

11. Prosecutorial misconduct for not sharing a surveillance tape from a Wawa convenience store ("Claim XI");

12. Petitioner's grand jury indictment failed to allege all essential elements of the charged criminal wrongs ("Claim XII");

13. Trial counsel was ineffective for failing to oppose the State's motion for consolidation versus seeking severance ("Claim XIII");

14. Ineffective assistance of appellate counsel by: (1) not pursuing the gross neglect of trial counsel's failure to pursue a mistrial when the jury deadlocked; and (2) the prosecution's submission of a letter without authenticating it ("Claim XIV");

15. Petitioner's extended term must be reversed because the trial judge failed to set forth its justification and used prohibited cases to apply an extended term sentence ("Claim XV");

16. Petitioner is entitled to an evidentiary hearing that trial counsel was ineffective by failing to investigate and present an adequate alibi defense or raise these issues on appeal ("Claim XVI");

17. Petitioner's conviction for conspiracy to commit murder is against the weight of the evidence ("Claim XVII");

18. Counsel's remedial assistance led to an unfair trial and Petitioner's inability to prove his actual innocence ("Claim XVIII");

19. Appellate and PCR counsel's remedial assistance led to Petitioner's inability to prove his actual innocence ("Claim XIX");

20. New Jersey citizens were denied their right to witness Petitioner's trial ("Claim XX");

21. Prosecutorial misconduct by using perjured testimony from Miller because the prosecutor knew that Miller was given a plea deal for conspiracy to commit an assault ("Claim XXI");

22. Prosecutor knowingly used perjured testimony from Kendrick ("Claim XXII");

23. Jury's verdict was against the weight of the evidence ("Claim XXIII"); and

24. Trial judge failed in his duty to be and maintain an impartial tribunal ("Claim XXIV").

Respondents filed a response in opposition to Petitioner's amended habeas petition. (*See* ECF 17 & 18). Petitioner then filed a reply in support of his amended habeas petition. (*See* ECF 19). The case is now ready to be adjudicated.

## III.  LEGAL STANDARD

An application for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws or treaties of the United States. *See Engle v. Isaac*, 456 U.S. 107, 119 (1982); *see also Mason v. Myers*, 208 F.3d 414, 415 n.1 (3d Cir. 2000) (citing 28 U.S.C. § 2254). Petitioner filed this petition for writ of habeas corpus after

April 24, 1996, thus, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (Apr. 24, 1996), applies. *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d).

As a threshold matter, a court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)). "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle set forth by the Supreme Court at the time the state court renders its decision." *Id.* (citations omitted). A federal habeas court making an unreasonable application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *See Williams v. Taylor*, 529 U.S. 362, 409 (2000). Thus, "a federal court may not issue a writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. Furthermore, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e); *see also Rice v. Collins*, 546 U.S. 333, 339 (2006) (petitioner bears the burden of rebutting presumption by clear and convincing evidence); *Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir. 2001) (factual determinations of state trial and appellate courts are presumed to be correct).

The AEDPA standard under § 2254(d) is a "difficult" test to meet and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). A petitioner carries the burden of proof and with respect to review under § 2254(d)(1), that review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 563 U.S. at 181.

In applying AEDPA's standards, the relevant state court decision that is appropriate for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008). Furthermore, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *Rambo v. Adm'r East Jersey State Prison*, 762 F. App'x 105, 107 (3d Cir. 2019) (noting the applicability of *Ylst*'s "look through" doctrine); *Dennis Sec'y Dep't of Corr.*, 834 F.3d 263, 353 n.10 (3d Cir. 2016) (Jordan, J., concurring in part and concurring in the judgment) (noting that while *Ylst* predates the passage of AEDPA, the *Ylst* presumption that any subsequent unexplained orders upholding the judgment will be presumed to rest upon the same ground is still valid). These deferential standards apply "even where there has been a summary denial" by the state court. *Cullen*, 563 U.S. at 187.

## IV.   DISCUSSION

### A.   Claim I – *Miranda*

Plaintiff's first claim asserts that officers violated his Fifth Amendment right against self-incrimination when they used a question-first/*Miranda* warnings second technique. The New

Jersey Superior Court, Appellate Division analyzed this claim as follows on Petitioner's direct appeal:

> Defendant's argument attacking the admissibility of the statement he gave to Prosecutor's Detective Whipple and Franklin Detective Lacewell is completely without merit. In arguing the *Miranda* motion before the trial court, defense counsel stipulated to the factual record. He argued defendant was not apprised of his rights under *Miranda* before the interrogation began. The record does not support defendant's argument. The interrogation technique known as "question-first, warn-later," which the Supreme Court properly denounced in *State v. O'Neill,* 193 *N.J.* 148 (2007), did not occur here. As the trial court correctly determined, defendant made a knowing and voluntary waiver of his *Miranda* rights *before* the detectives began asking him any questions concerning Love's death. This point needs no further elaboration. We reject defendant's argument as reflected in Point I of his appellate brief substantially for the reasons expressed by the motion judge.

*Singer*, 2014 WL 10213245, at *12. Given that the Appellate Division relied extensively on the trial judge's denial of this claim, this Court finds it important to recite, as stated below, the trial judge's analysis in denying this claim:

> With regard to the Miranda issue, certainly a person must be given appropriate warnings if he's subjected to interrogation while in custody. See Miranda versus Arizona, 384 US 436. I think in this case it's clearly acknowledged that he was in custody. He was arrested. [H]e was taken to the County Prosecutor's Office. [H]e was charged with crimes and in custody.
>
> It appears in listening to the arguments today. [T]here's certainly a scheme about classifying the conversation that took place between the Detective and the Defendant prior to the actual giving of the Miranda rights. Fortunately, we do have a video of the statement that was given. We have a transcript of that video. And as I understand it, as accepted by both sides, that this is the video taking place immediately upon the first contact between the Detective and the Defendant.
>
> And so both sides are arguing back and forth whether or not State versus O'Neill has effect in this case. O'Neill cited at 193 New Jersey, 148. The case that deals with question first, warn later theory that the Supreme Court has dealt with.

With regard to O'Neill, the decision delivered by Justice Albin in one of the opening paragraphs at page 154 cites the factual scenario of O'Neill.   In this case two homicide detectives subjected Defendant, Michael O'Neill, to a 95-minute interrogation while he was in official custody, eliciting from him incriminating statements that linked him to the killing of Louis Kanasaka, a taxi driver.  Only then, for the first time, did the detectives advise the Defendant of his Miranda rights.   Without any significant break, the Detective resumed the interrogation, questioning the 19-year old Defendant for nearly five hours more, taking two taped statements which singly and together directly connected him to the shooting death of the cab driver.

At trial the State only sought to admit the Defendant's statement after the initial 95-minute unwarned interrogation.  The Court goes onto review the issuance of Miranda and privileges and went onto review the difference between State standards and Federal standards with regard to Miranda issues.

On page 180, the Court holds, or the Supreme Court holds: Therefore, as a matter of State law, we hold when Miranda warnings are given after custodial interrogation has already produced incriminating statements, the admissibility of the post warning statements will turn on whether the warnings function effectively in providing the Defendant with the ability to exercise State law privilege against self-incrimination.   And then they go into the factors to review, including the question and nature of admissions by the Defendant before Miranda, proximity in time and place between the pre and post warning, whether the same officers conducted both the warned and unwarned interrogation, whether the officers informed the Defendant of his pre-warnings, statements could not be used against him.  The degree to which the post warning question is a continuation of the pre-warning question.

The Court goes on to state, at page 181, we emphasize that we are not pronouncing a bright line rule, for example, if the officer's pre-warning question is brief, and the Defendant's admissions are not incriminating, or barely incriminating, and if there's a substantial break in time between the pre and post, then those factors would militate against suppression.

Well, as I indicated, fortunately we do have a transcript that occurred between the Detective and the Defendant, and I don't have the total statement, but I do have the pertinent pages.  And it's not apparent in reviewing this, Detective starts off the conversation with: "How you doing?"  Along with Detective Lacewell.  And then they go over

his name, that they're law enforcement, and where they're from. And they start to explain to the Defendant what they're going to talk about. They're going to talk about a little story and the story begins Friday night with you and Monroe. We're not really concerned about Monroe, we're concerned about Franklin Township, Ten's Enough, A social club. And these cell phones and a kid who's blaming it on you. Brim, a 300-pound idiot. That he gave everybody up. And you're being charged with a homicide. And I have all these stories, but I don't have your story. And this is the one opportunity to give your story. To all this the response is as reflected by the Defendant as pointed out by the Prosecutor are, uh-huh, all right, okay, uh-huh, okay, all right, all right, okay. And on page three, the Detective finally asked: "Do you understand what I'm getting at?"

Answer: "Okay, let's get to it."

In other words, stop beating around the bush, let's go. And then he starts to give him his rights. There's no real contention that he didn't give him the appropriate Miranda warnings.

To review the Miranda warnings he says: "I'm going to read you your rights. You have a right to remain silent, do you understand?"

"Uh-huh."

"Is that a yes?"

"Anything you say can be used in court against you, do you understand?"

"Answer: Yes."

"You have a right to speak to a lawyer at any time and have him with you, do you understand?"

"Answer: Yes."

"If you cannot afford a lawyer but want one, one will be provided no cost prior to questioning, do you understand?"

"Answer: Yes."

"A decision to waive these rights is not final, you always have the opportunity to stop answering questions, speak with a lawyer at any

time.  In other words, you can stop at any time, do you understand this?"

"Okay."

"I acknowledge that I've been advised of my rights as stated above. I understand these rights.  I further acknowledge that I've been advised of the criminal complaint which I just told you has been filed against me, or issued against me, and I've been informed as to the nature of the charges therein, that's what I just told you. Understanding my rights that a criminal complaint has been issued and still agree to speak with the police and basically all I want to do, Malik, I just want to get your version of what the hell happened over the weekend, all right?  You agree to talk with us?

"Answer:  Yeah."

It's obvious to me that what's going on, the Detective at that point has gone over a Miranda form and is basically reading from the form and verifying that the Defendant understands each of his rights and he gets a positive response to each of those questions.  And further, later, on page five, "I'm going to ask you to mark yes, if you don't mind."

And he answers:  "Uh-huh."

"And just mark your initial and sign your initials here."  And then they get into the conversation about the events.  So although I have not been presented with the Miranda waiver form, I'm assuming that that's what is reviewed at that point since that does not seem to be argued by either side.

But what's noteworthy is that this case is highly unlike the O'Neill case.  As I indicated previously in that situation, two detectives had the Defendant, 19-year old, in custody, questioned him for 95 minutes, and elicited incriminating information from him about the shooting death of a cabbie.  I believe it was in New Brunswick.

Here, I don't have any incriminating statements coming from the Defendant prior to the point of the Defendant receiving his appropriate Miranda warnings.  It appears that all the warnings are appropriate, that they were understood by Defendant, they were waived, that he agreed to speak with the police.  So I don't find this to be a Miranda violation on anything close to what's represented in O'Neill.  And a good part of O'Neill is really addressing the second part of the equation.

24

If you have a situation where the police have gained information from the Defendant inappropriately by not giving these warnings, and you later get a statement, can he use the statement after he gets the warnings?  And then the Court goes and reviews factors that you need to review.  They lay them right on you.

And if you can meet those factors, even though you have an obvious Miranda violation, you can still introduce the statement.  But we don't have that here.  As indicated, they're not setting forth the bright line that if the officer's pre-warning questioning is brief and the Defendant's admissions are not incriminating, this is what we have here.  It's not even questioning, it's statements by the Detective with no responses by the Defendant other than uh-huh, okay.  He's not even getting into the facts and circumstances of the events. . . .

The Defendant is not getting into the facts and circumstances.  He didn't make any admissions prior to actually getting the warnings and understanding them and waiving them and agreeing to talk to the police.

So, we don't really have a Miranda violation, we don't really have an O'Neill violation.  It appears that the appropriate warnings were given, beyond a reasonable doubt.  And that the statement would be admissible . . . .

[A]s far as the Miranda issue is concerned, I'm satisfied he received the appropriate warnings, understood them, waived them, and agreed to speak with the police and did so.  And there's no O'Neill type of violation here.

(ECF 18-1 at 32-36).

In *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)*,* the United States Supreme Court explained that a person questioned by law enforcement after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *See also Oregon v. Mathiason,* 429 U.S. 492, 495 (1977).  When the police subject a person in custody to interrogation without warning him or her of those rights, the statements they elicit may not be

admitted for certain purposes in a criminal trial. *See Stansbury v. California,* 511 U.S. 318, 322 (1994). A person may waive his *Miranda* rights. But that waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine,* 475 U.S. 412, 421 (1986).

Petitioner asserts in Claim I that the detectives engaged in an improper "two-step" technique which thereby violated his constitutional rights. When a suspect in custody makes incriminating statements without the benefit of *Miranda* warnings and is then subsequently given *Miranda* warnings and again makes incriminating statements, "it is necessary to determine if the intervening warnings were sufficient to inform the suspect of his/her rights so that the suspect could properly decide whether or not to waive the protections of *Miranda* and make statements to the police." *United States v. Naranjo,* 426 F.3d 221, 227 (3d Cir. 2005) (citing *Oregon v. Elstad,* 470 U.S. 298 (1985)). This type of scenario raises potential concerns that the police have employed a "two-step questioning technique based on a deliberate violation of *Miranda,*" in which "[t]he *Miranda* warning [is] withheld to obscure both the practical and legal significance of the admonition when finally given." *Missouri v. Seibert,* 542 U.S. 600, 620 (2004) (Kennedy, J. concurring); *Naranjo,* 426 F.3d at 231–32 (citing *Marks v. United States,* 430 U.S. 188, 193 (1977)) (finding that, because *Seibert* was a plurality opinion, Justice Kennedy's concurrence should be viewed as "the holding of the Court" because it provided the "narrowest rationale").

The two-step questioning approach "permits the accused to conclude that the right not to respond did not exist when the earlier incriminating statements were made." *Seibert,* 542 U.S. at 620 (Kennedy, J. concurring). The approach is "based on the assumption that *Miranda* warnings will tend to mean less when recited midinterrogation, after inculpatory statements have already

been obtained." *Id.* Where the initial failure to warn was part of a "*deliberate* two-step strategy . . . postwarning statements that are related to the substance of the prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Id.* at 622 (emphasis added).

The two-step approach and *Seibert* are not implicated in this case. Indeed, as noted by the trial court, the record indicates that Petitioner never made any incriminating statements prior to detectives giving Petitioner the *Miranda* warnings. As a result, the trial court properly noted that the potentially prohibited two-step approach was not applied by detectives in this case. *Accord United States v. Isles*, Crim. No. 14-51, 2015 WL 327143, at *12 (D.V.I. Jan. 26, 2015) (citing *Bobby v. Dixon*, 132 S. Ct. 26, 31 (2011)) (prohibited two-step approach not implicated where defendant made no incriminating statements prior to *Miranda* warnings). Accordingly, Petitioner fails to show that the state courts unreasonably applied or acted contrary to clearly established federal law in denying this claim or that the denial of this claim was based on an unreasonable determination of the facts. Claim I is denied.

B. Claim II – Williams' Identification

In Claim II, Petitioner asserts that Williams' identification of Petitioner as the shooter should have been suppressed because the identification procedure used by the police was impermissibly suggestive. The New Jersey Superior Court, Appellate Division deciding Petitioner's direct appeal provided the last reasoned decision on this claim and analyzed it as follows:

> We next consider defendant's argument attacking the trial court's failure to suppress Williams's out-of-court identification in which she identified defendant as the man who shot and killed Love. Defendant argues the identification procedure used was impermissibly and unnecessarily suggestive, resulting in a strong likelihood of misidentification. Under these circumstances,

defendant argues the trial court should have found Williams's identification unreliable and inadmissible at trial. Specifically, defendant emphasizes only two photographs in the array of "arguably 'light skinned' black males," had facial tattoos. According to defendant, this rendered the entire photo array unduly suggestive.

The State argues the identification procedure followed by Somerset County Sheriff's Department Officer Barbara Cole, who prepared the array, was not unduly suggestive and was in compliance with the Attorney General's guidelines regarding the preparation of photographic lineups. The array included photographs of African–American men who were similar in appearance to defendant. The State also claims the Franklin Township Detective who showed Williams the array followed the Attorney General's guidelines as well.

We are not persuaded by defendant's arguments. The trial court conducted a hearing in response to defendant's motion challenging Williams's out-of-court identification. The motion judge found the photographic lineup was not impermissibly suggestive. He found Williams's identification of defendant reliable because she testified the police officer did not emphasize defendant's photograph in the lineup and did not pressure her in any way into making an identification. The judge reviewed the photographs used in the lineup and noted people in the photographs were "[r]emarkably similar in facial features." There was nothing to indicate defendant's picture was highlighted by the police in any fashion, or that the police made any suggestion as to which picture to select.

The judge also noted that Williams identified defendant in court as the person she saw shoot Love. She was familiar with defendant, having seen him before on several occasions. She also had an unobstructed view of the shooting. Williams saw defendant with the gun in his hand and pull the trigger. She was "positive on the identification"; in fact, "[s]he couldn't be more positive." Finally, the judge noted Williams identified defendant just two days after the shooting.

As an appellate court, we are bound to defer to the trial court's findings based on testimony presented at a hearing to determine the admissibility of a witness' identification. *State v. Adams,* 194 *N.J.* 186, 203 (2008). "[T]he trial court's findings that photographic identification procedures were reliable should not be disturbed if there is sufficient credible evidence in the record to support the findings." *Ibid.*

In order to reject an out-of-court identification, the court must find the procedures used were "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 88 S. Ct. 967, 971, 19 *L. Ed.* 2d 1247, 1253 (1968). *See also State v. Herrera,* 187 *N.J.* 493, 503 (2006). The United States Supreme Court has established procedures to ensure that identification procedures are not unduly suggestive. *See United States v. Wade,* 388 U.S. 218, 227–41, 87 S. Ct. 1926, 1932–40, 18 *L. Ed.* 2d 1149, 1157–65 (1967). Our own Supreme Court has also followed suit. *State v. Madison,* 109 *N.J.* 223, 232 (1988). To determine the admissibility of eyewitness identifications, our Supreme Court adopted the two-prong test articulated by the United States Supreme Court in *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 *S. Ct.* 2243, 2253, 53 *L. Ed.* 2d 140, 154 (1977).

The first prong requires the court to "ascertain whether the identification procedure was impermissibly suggestive[.]" *Herrera, supra,* 187 *N.J.* at 503–04. "What is being tested in the preliminary inquiry as to admissibility is whether the choice made by the witness represents his own independent recollection or whether it in fact resulted from the suggestive words or conduct of a law enforcement officer." *State v. Farrow,* 61 *N.J.* 434, 451 (1972), *cert. denied,* 410 U.S. 937, 93 S. Ct. 1396, 35 *L. Ed.* 2d 602 (1973).

Under the second prong, if the procedure is found to be impermissibly suggestive, the court must then decide whether the procedure was nevertheless reliable in light of the totality of the circumstances. The court must weigh the suggestive nature of the identification against the reliability of the identification. *State v. Romero,* 191 *N.J.* 59, 76 (2007).

Under this analytical approach, "reliability is the linchpin in determining the admissibility of identification testimony[.]" *Manson, supra,* 432 *U.S.* at 114, 97 *S. Ct.* at 2253, 53 *L. Ed.* 2d at 154. In determining reliability of the identification testimony, we consider

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be

weighed the corrupting effect of the suggestive identification itself.

[*Ibid.*]

Here, the photographic lineup was set up in a manner so that the other individuals looked similar to defendant, using the criteria of race, ethnicity, hair type, facial features, gender, and eye color. The motion judge found defendant's photograph did not stand out from the other five photographs. After reviewing the photographs, the judge explained in detail the similarities between defendant's photograph and the five other photographs used in the lineup. The judge also noted that looking at the photograph, defendant's "two tear drop tattoos" located on the left side of his cheek looked like an ordinary blemish on a person. He emphasized that some of the other individuals in the photographs used in the lineup had similar looking blemishes. In short, the procedures employed by the police officers here were not unduly suggestive. There was no evidence that the identification made through the use of these photo arrays was tainted by any improper suggestiveness rendering the identification unreliable.

*Singer*, 2014 WL 10213245, at *12–14.

In determining whether the state court's decision was contrary to or an unreasonable application of clearly established federal law, the applicable law relevant to this claim is as follows:

"[a]n identification procedure that is both (1) unnecessarily suggestive and (2) creates a substantial risk of misidentification violates due process." *United States v. Brownlee,* 454 F.3d 131, 137 (3d Cir. 2006) (citing *Manson v. Brathwaite,* 432 U.S. 98, 107 (1977)). "Unnecessary suggestiveness contains two component parts: that concerning the suggestiveness of the identification and that concerning whether there was some good reason for the failure to resort to less suggestive procedures." *Id.* (internal quotation marks omitted). An unnecessarily suggestive identification procedure does not create a substantial risk of misidentification if it "possesses sufficient aspects of reliability" given the "totality of the circumstances." *Id.* at 139. Factors we consider in that analysis include: "(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness'[s] degree of attention; (3) the accuracy of the witness'[s] prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and confrontation." *Id.* (citing *Neil v. Biggers,* 409 U.S. 188, 199 (1972)).

*United States v. Diaz,* 444 F. App'x 551, 554–55 (3d Cir. 2011).

As stated above, the New Jersey Superior Court, Appellate Division determined that the identification procedure was not unnecessarily suggestive. The Appellate Division correctly identified and applied controlling United States Supreme Court precedent governing identification procedures. It then aptly applied that law to the facts presented with respect to Williams' identification. This Court also requested and received a copy of the photo array to determine whether the state court's decision was based on an unreasonable determination of the facts related to the photo array. (*See* ECF 27). Based on this Court's review of the photo array, the denial of this claim was not based on an unreasonable determination of the facts. Accordingly, Petitioner fails to show that the denial of this claim by the state courts was contrary to or an unreasonable application of clearly established federal law. Claim II is denied.

C. Claim III – Lesser Included Offense Instruction

In Claim III, Petitioner argues that the trial court erred in failing to instruct the jury on a lesser included offense of manslaughter/aggravated assault along with conspiracy to commit aggravated assault and that trial counsel was ineffective in failing to request such a charge. Regarding Petitioner's claim that the trial court erred in failing to instruct the jury on lesser included offenses, the New Jersey Superior Court, Appellate Division denied this claim in Petitioner's direct appeal as follows:

> Trial judges are not required to "meticulously sift through the entire record in every murder trial to determine if some combination of facts and circumstances might rationally sustain a manslaughter charge." *State v. Purnell,* 126 *N.J.* 518, 540–41 (1992). It is only when the facts "clearly indicate" the appropriateness of that charge that the "duty of the trial court ... arises." *Id.* at 541. Here, the record shows no rational basis to impose an obligation on the trial court to charge the jury sua sponte with the lesser included offense of aggravated manslaughter as defined in *N.J.S.A.* 2C:11–4(a)(1).

*Singer*, 2014 WL 10213245, at *14.

With respect to any purported constitutional error related to the trial court's purported failure to instruct the jury on a lesser included offense, the United States Supreme Court has not recognized that an individual has a due process right to jury instructions on lesser-included offenses in non-capital cases. *See, e.g., Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) ("Outside of the capital context, we have never said that the possibility of a jury misapplying state law gives rise to federal constitutional error"); *Geschwendt v. Ryan*, 967 F.2d 877, 884 n.13 (3d Cir. 1992) (observing that the Supreme Court, in *Schad v. Arizona*, 501 U.S. 624 (1991), cast doubt on the theory that due process always requires the court to instruct on a lesser-included offense in non-capital offenses by applying a harmless-error standard; conviction of an offense higher up on the ladder, is a reliable indicator that a jury would not have convicted of the least included offense that was not charged); *cf. Beck v. Alabama*, 447 U.S. 625, 627 (1980) (holding it unconstitutional to impose a sentence of *death* "when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense").  Because this is a non-capital case, the denial of this claim by the state court was not contrary to or an unreasonable application of *clearly established* federal law.

Petitioner also is not entitled to habeas relief on his claim that trial counsel was ineffective for failing to argue for a lesser-included offense jury instruction.  In *Strickland v. Washington,* 466 U.S. 668 (1984), the Supreme Court articulated a two-prong test for demonstrating when a petitioner is entitled to federal habeas relief on an ineffective assistance of counsel claim.  First, a petitioner must show that considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *See id.* at 688; *see also Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (noting that it is necessary to analyze an ineffectiveness claim considering all of the

circumstances) (citation omitted).  A petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment.  *See Strickland*, 466 U.S. at 690. Under the first prong of *Strickland*, scrutiny of counsel's conduct must be "highly deferential." *See id.* at 689.  Indeed, "[c]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. The reviewing court must make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.  If counsel makes "a thorough investigation of law and facts" about his plausible options, the strategic choices he makes accordingly are "virtually unchallengeable." *Gov't of Virgin Islands v. Weatherwax*, 77 F.3d 1425, 1432 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91).  If, on the other hand, counsel pursues a certain strategy after a less than complete investigation, his choices are considered reasonable "to the extent that reasonable professional judgments support the limitations on investigation." *Rolan v. Vaughn*, 445 F.3d 671, 682 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91).

The second prong of *Strickland* requires a petitioner to affirmatively prove prejudice.  *See* 466 U.S at 693.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*; *see also McBridge v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 102 n.11 (3d Cir. 2012).  "This does not require that counsel's actions more likely than not altered the outcome, but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case.  The likelihood of a different result must be substantial, not just

conceivable." *Harrington v. Richter*, 562 U.S. 86, 111-12 (2011) (internal quotation marks and citations omitted).

"With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.'" *Rainey v. Varner*, 603 F.3d 189, 201 (3d Cir. 2010) (quoting *Strickland*, 466 U.S. at 697).

To show prejudice, Petitioner would have to show that there is a reasonable probability that the jury would have convicted him of conspiracy to commit manslaughter and/or aggravated assault and not of murder had counsel made the request. *See Breakiron v. Horn*, 642 F.3d 126, 138 (3d Cir. 2011).

Under New Jersey's manslaughter law, a criminal homicide constitutes manslaughter when it is committed recklessly or when committed in the heat of passion resulting from reasonable provocation. *See* N.J. Stat. Ann. § 2C:11-4b. Here, as noted by the Appellate Division, there was no reasonable evidence produced at trial that Petitioner acted in a reckless manner. Furthermore, the evidence did not indicate that Petitioner killed Love in the heat of passion resulting from reasonable provocation. Accordingly, Petitioner fails to show that he was prejudiced by counsel's failure to request such a lesser-included offense jury charge. *See, e.g., Jackson v. Britton*, No. 08-4203, 2010 WL 1337730, at *7 (E.D. Pa. Apr. 6, 2010) (even if trial counsel had not requested involuntary manslaughter charge, ineffective assistance of counsel claim would fail since trial evidence did not reasonably support verdict for involuntary manslaughter). Thus, Claim III is denied.

D. Claim IV – Excessive Sentence

In Claim IV, Petitioner argues that his aggregate sentence of forty years was manifestly

excessive. Petitioner raised this claim on direct appeal. The New Jersey Superior Court, Appellate

Division determined that the sentence imposed was factually warranted and legally sustainable.

*See Singer*, 2014 WL 10213245, at *14.

With respect to the applicable constitutional law:

> "[a] federal court's ability to review state sentences is limited to
> challenges based upon proscribed federal grounds such as being
> cruel and unusual, racially or ethnically motivated, or enhanced by
> indigencies.'" *Merritt v. Bartkowski*, No. 11–3756, 2013 WL
> 4588722, at *15 (D.N.J. Aug. 28, 2013) (quoting *Grecco v. O'Lone*,
> 661 F. Supp. 408, 415 (D.N.J. 1987) (citation omitted)). Thus, a
> challenge to a state court's discretion at sentencing is not reviewable
> in a federal habeas proceeding unless it violates a separate federal
> constitutional limitation. *See Pringle v. Court of Common Pleas*,
> 744 F.2d 297, 300 (3d Cir. 1984). *See also* 28 U.S.C. § 2254(a);
> *Estelle* [*v. McGuire*], 502 U.S. [ ] 62, 67 [(1991)].

*Burns v. Warren*, No. 13–1929, 2016 WL 1117946, at *43 (D.N.J. Mar. 22, 2016). Regarding

showing that a sentence is cruel and unusual,

> [t]he Supreme Court has explained that the "Eighth Amendment,
> which forbids cruel and unusual punishments, contains a narrow
> proportionality principle that applies to non-capital sentences."
> *Ewing v. California*, 538 U.S. 11, 20, 123 S. Ct. 1179, 1185, 155 L.
> Ed. 2d 108 (2003) (citations omitted). A court must consider three
> proportionality factors when evaluating Eighth Amendment
> challenges: (1) the gravity of the offense and the harshness of the
> penalty; (2) the sentences imposed on other criminals in the same
> jurisdiction; and (3) the sentences imposed for commission of the
> same crime in other jurisdictions. *Solem v. Helm*, 463 U.S. 277,
> 290–92, 103 S. Ct. 3001, 3010, 77 L. Ed. 2d 637 (1983). In
> conducting this analysis, a court grants substantial deference to
> legislative decisions regarding punishments for crimes. *United
> States v. Rosenberg*, 806 F.2d 1169, 1175 (3d Cir.1986); [*United
> States v.*] *Miknevich*, 638 F.3d [178,] [ ] 186 [(3d Cir. 2011)]
> ("Generally, a sentence within the limits imposed by statute is
> neither excessive nor cruel and unusual under the Eighth
> Amendment . . . because we accord substantial deference to

> Congress, as it possesses broad authority to determine the types and limits of punishments for crimes.").
>
> The first factor acts as a gateway prong to the proportionality inquiry. The Eighth Amendment, after all, only forbids sentences that are "grossly disproportionate" for a conviction for the crime involved. If the defendant fails to demonstrate a gross imbalance between the crime and the sentence, a court's analysis of an Eighth Amendment challenge is at an end. Successful proportionality challenges in non-capital cases are "exceedingly rare." *Ewing*, 538 U.S. at 21, 123 S. Ct. at 1185 (quoting *Rummel v. Estelle*, 445 U.S. 263, 272, 100 S. Ct. 1133, 1138, 63 L. Ed. 2d 382 (1980)).

*United States v. Burnett*, 773 F.3d 122, 136–37 (3d Cir. 2014).

Petitioner fails to show that the denial of this claim by the state courts was contrary to or an unreasonable application of clearly established federal law. Petitioner was convicted of conspiracy to commit murder in the first degree, three counts of conspiracy to murder three potential prosecution witnesses and conspiracy to commit witness retaliation, and was sentenced to an extended term. In New Jersey, the maximum extended term sentence called for life imprisonment. *See* N.J. Stat. Ann. § 2C:47-7(a)(2). Petitioner received a sentence below life imprisonment, or within the statutory range for an extended term. Accordingly, he fails to show that his sentence runs afoul of the Eighth Amendment. *See, e.g.*, *Burtrim v. D'Ilio*, No. 14-4628, 2018 WL 1522706, at *17 (D.N.J. Mar. 28, 2018) (denying federal habeas relief on excessive sentence claim noting petitioner's sentence fell within statutory limits). Claim IV is therefore denied.

### E. Claim V – Evidentiary Hearing on Petitioner's Ineffective Assistance of Counsel Claim

In Claim V, Petitioner asserts that the PCR court erred in failing to conduct an evidentiary hearing on his ineffective assistance of counsel claims. This claim in and of itself does not state a cognizable federal habeas claim. Indeed, "[t]his Court cannot review a state PCR Court's determination under state law of whether to conduct an evidentiary hearing." *Vargas v. Powell*,

No. 15–2622, 2016 WL 3298223, at *4 (D.N.J. June 8, 2016) (citing *Estelle v. McGuire*, 502 U.S. 62, 67 (1991); *State v. Jones*, 219 N.J. 298, 310–11 (N.J. 2014)). In general, "the federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's *collateral* proceeding does not enter into the habeas calculation." *Hassine v. Zimmerman,* 160 F.3d 941, 954 (3d Cir.1998); *see also Lambert v. Blackwell,* 387 F.3d 210, 247 (3d Cir.2004) ("[H]abeas proceedings are not the appropriate forum for Lambert to pursue claims of error at the PCR[ ] proceeding."). Thus, a petitioner's claim that the PCR court should have conducted an evidentiary hearing is not cognizable as a habeas claim. *Accord Davis v. New Jersey,* No. 12–5748, 2014 WL 2615657, at *17 (D.N.J. June 12, 2014) (petitioner fails to state a cognizable claim under section 2254 where he argues that PCR court erred in failing to conduct an evidentiary hearing); *Vreeland v. Warren,* No. 11–5239, 2013 WL 1867043, at *4 n. 2 (D.N.J. May 2, 2013).

Accordingly, Petitioner is not entitled to federal habeas relief on Claim V.

F.   Claim VI – Ineffective assistance of counsel surrounding counsel's failure to do pretrial investigation to call witnesses

In Claim VI, Petitioner argues as follows:

> The complete failure of trail [sic] counsel to do any investigation in preparation for Petitioner's trial was patently deficient. Petitioner was greatly prejudiced because as a result of trial counsel's failure to prepare for trial, witnesses who would have exonerated Petitioner and support his alibi defense were not presented to the jury. Ineffectiveness is generally clear in the context of complete failure to investigate because counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when she has not obtained the facts on which such a decision could have been made. For example, "the complete failure to investigate corroborating witnesses cannot be attributed to trial strategy and tactics."[ ]. To be entitled to deference, a decision not to pursue a particular line of investigation must be based on reason, not dereliction of duty. The attorney did not visit the scene, attempt to locate potential witnesses on his own, or hire an investigator to

search for and interview witnesses. Nor did he subpoena witnesses to trial. [ ]holding that failure to conduct more than "cursory investigation" of three potential witnesses, and to call them stand, "constitutes deficient performance" by counsel prejudicing defendant. On another recent occasion, the Third Circuit has found inadequate preparation to constitute ineffective representation, entitling the defendant to Federal relief. In light of these principles, it should be clear the decision made by trial counsel in this case was neither reasonable nor strategic. Because of his failure to prepare for trial, counsel's purported "strategic choice" of not calling a favorable witness loses his presumption of competence.

(ECF 9 at 28). The New Jersey Superior Court, Law Division analyzed this claim during Petitioner's PCR proceedings. That court described the relevant ineffective assistance of counsel legal standard and analyzed this claim as follows:

Petitioner claims that he was denied his right to effective assistance of counsel under the Sixth Amendment to the U.S. Constitution and the New Jersey Constitution. The right to effective assistance of counsel is "critical to the ability of the adversarial system to produce just results." Strickland, 466 U.S. at 685.

In assessing a claim of ineffective assistance of counsel, this Court looks to the standard established in Strickland v. Washington, 466 U.S. 668, which has been adopted by the New Jersey Supreme Court. State v. Fritz, 105 N.J. 42 (1987); State v. Preciose, 129 N.J. 451 (1992), and State v. Echols, 199 N.J. 344 (2009). In Strickland, the U.S. Supreme Court devised a two-part test to review such a claim. First, defendant must show that counsel made errors that were so serious that the attorney's performance was "deficient" in providing the basic proficiency of counsel guaranteed by the Sixth Amendment to the U.S. Constitution. Strickland, 466 U.S. at 687. There exists a strong presumption that counsel's assistance was reasonably professional and that any "challenged action might be considered sound trial strategy." Id. at 689 (internal quotation marks omitted). The Court must give a high degree of deference to the counsel's decisions and cannot evaluate the attorney's performance through the lenses of hindsight. Id.

For the second part of the test, "defendant must show that the deficient performance prejudiced the defense." Id. In certain circumstances prejudice can be presumed where defendant has been completely denied counsel or counsel failed to provide meaningful adversarial testing of the prosecution's case. United States v.

Chronic, 466 U.S. 648, 659 (1984).   Absent those egregious circumstances, the burden is on defendant to prove a reasonable probability that, but for the trial counsel's deficiencies, the result of the proceeding would have been different.   Strickland, 466 U.S. at 694.   "A reasonable probability is a probability sufficient to undermine confidence in the outcome."   Id.

Defendant argues that trial counsel was ineffective for failing to conduct sufficient pre-trial investigation or call favorable witnesses. The defendant fails to specify, however, how trial counsel failed to conduct sufficient investigation or how he was thereby prejudiced. The defendant merely baldly proclaims a "complete failure of trial counsel to do any investigation in preparation for Petitioner's trial."

The State argues not only that trial counsel performed a comprehensive investigation of the defendant's alleged alibi and presented numerous witnesses in support of this strategy, but also that these bald assertions are insufficient to establish a prima facie claim that would entitle defendant to an evidentiary hearing.   See State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999).  This Court concurs with the State.  The defendant's allegations are long on generalities and "net" legal conclusions, but very short, or utterly silent, on specific facts and specific legal theories.  The defense also fails to address the strength of the State's proofs and, as the State rightfully notes, the trial counsel succeeded in casting reasonable doubt as to the petitioner's role in the murder and possession of a weapon for an unlawful purpose charges, in spite of the strength of the State's proofs and multiple admissions by the defendant.

At trial, multiple witnesses testified as to the defendant's presence at the scene of the murder, as well as Aisha Williams testifying as to seeing the defendant shoot Michael Love in the head.   The defendant was identified by Larry Blunt, Aisha Williams, and James Rice in separate photographic arrays.   The defendant made admissions to fellow inmates John Simpkins, Marquis Smith, and Admir Hoornaert.  The defendant also made troubling statements to Detectives DeMeo and Bisignano during his arrest.   The State introduced substantial evidence that showed that the victim was, in fact, killed by a gunshot wound to the head, as well as defendant being told to "take care of" the victim.  Finally, Sonny Jenkins not only testified as to the defendant's admission of guilt on the murder, but also his attempt to have trial witnesses killed.  Again, in spite of the strength of the State's proofs, including multiple admissions by the defendant, trial counsel's effective assistance protected the defendant from being convicted of the murder and possession of a weapon for an unlawful purpose charges.   Carrying out more

investigation would not have had any appreciable effect upon the defense of the case.  Defendant does not allege any facts that further investigation could have revealed.

In regards to defendant's contention that trial counsel was ineffective for not calling witnesses, the defendant conveniently overlooks numerous witnesses called at trial.  Trial Counsel [sic] attempted to strengthen the defendant's alibi with numerous witnesses, including the petitioner's girlfriend.  Engineers were called as witnesses in order to testify as to how the cell phone towers functioned in order to rebut the State's contentions regarding the phone records.  Furthermore, trial counsel called officers of the Somerset County Jail to rebut the inmate witnesses' testimony regarding defendant's incriminating statements.  In his letter to counsel, defendant suggested trial counsel 'Subpoena several people who may actually be considered State's witnesses.'  This broad, generalized suggestion, lacking any details on which witnesses should be called or how they would help the defendant's case, are similar to the defendant's bald assertions in his petition for post-conviction relief.  The defendant similarly makes a vague contention that his convictions were against the weight of the evidence, but offers no description or which charges specifically were against the weight of the abundant evidence offered by the State.  The trial spanned over the course of six weeks, and trial counsel cross-examined State witnesses comprehensively.  Trial counsel could not have done so without extensive preparation and investigation into the case, and it is clear he called a number of witnesses in rendering effective assistance to his client.

Trial counsel's performance cannot be said to fall below an objective standard of reasonableness because he failed to advance frivolous legal arguments and motions.  See Strickland, 466 U.S. at 688.  Deciding not to conduct excessive investigation when such investigation would reveal nothing to help his case, or continue to extensively 'call witnesses' when there is no reason to believe that doing so would exculpate the defendant or affect the case, is sound trial strategy.  The Court must extend a high degree of deference to trial counsel's strategic decisions and cannot evaluate the attorney's performance through the lenses of hindsight.  Id. at 689.  The defendant has not articulated any cognizable prejudice flowing from trial counsel's decisions, but merely asserts legal conclusions absent specific foundational facts necessary to prove a claim of ineffective assistance of counsel.

For the second prong of Strickland, that the allegedly deficient performance 'prejudiced the defense,' the Defendant has not

established a prima facie case that he was prejudiced by trial counsel's performance. The aforementioned evidence strongly weighed against Defendant and the Defendant merely baldly asserted that his convictions were against the weight of the evidence and he was prejudiced thereby, along with his other generalized contentions. Defendant, however, has not articulated any prejudice resulting from trial counsel's decision, but has merely asserted legal conclusions absent any specific factual allegations necessary to entitle defendant to post-conviction relief. Thus, the Defendant's claim that counsel was ineffective for not advancing these arguments is without merit. Moreover, [t]he Court must give a high degree of deference to the counsel's decisions and cannot evaluate the attorney's performance through the lenses of hindsight. Strickland, 466 U.S. at 689. Therefore, the defendant fails to satisfy either prong of the Strickland test. 466 U.S. at 687.

(ECF 18-54 at 37-42). On appeal during Petitioner's PCR proceedings, the New Jersey Superior Court, Appellate Division again recited the relevant *Strickland* test for ineffective assistance of counsel claims and affirmed the denial of this claim as follows:

Defendant first contends the PCR court erred by failing to find that he established a prima facie claim of ineffective assistance of trial counsel based on counsel's failure to conduct an investigation and concomitant failure to present an adequate alibi defense. We find no merit to defendant's claim.

"Bald assertions" are insufficient to sustain a defendant's burden of establishing a prima facie case of ineffective assistance under the Strickland standard. State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999). PCR petitions must be "accompanied by an affidavit or certification by defendant, or by others, setting forth with particularity," State v. Jones, 219 N.J. 298, 312 (2014), "facts sufficient to demonstrate counsel's alleged substandard performance," ibid. (quoting State v. Porter, 216 N.J. 343, 355 (2013) ). Although a "[f]ailure to investigate an alibi defense is a serious deficiency that can result in the reversal of a conviction," Porter, 216 N.J. 343, 353 (2013), where, as here, a defendant "claims his trial attorney inadequately investigated his case, he must assert the facts that an investigation would have revealed, supported by affidavits or certifications based upon the personal knowledge of the affiant or the person making the certification," ibid. (quoting Cummings, 321 N.J. Super. at 170).

The PCR court correctly determined defendant failed to establish a prima facie case that his trial counsel was ineffective by failing to conduct an adequate investigation and call alibi witnesses. Defendant's initial and amended PCR petitions, and other submissions, are untethered to any affidavits or certifications describing what the investigation he claims his trial counsel failed to complete would have revealed or the manner in which particular witnesses would have supported an alibi defense. [FN 3] Cf. State v. Pierre, 223 N.J. 560, 583 (2015) (finding trial counsel's performance deficient where "counsel chose to forego evidence that could have reinforced [the defendant's] alibi"). Defendant therefore did not sustain his burden of establishing that his trial counsel's performance was deficient.

> [FN 3] Defendant's initial and amended petitions do not identify the purported alibi witnesses trial counsel allegedly failed to investigate or call as witnesses. Defendant's appendix includes a letter from defendant to the trial court requesting that thirteen named individuals be subpoenaed to testify at his trial, and in his pro se brief to the PCR court defendant renamed five of the individuals and claimed trial counsel was ineffective by failing to interview them. Defendant's PCR petitions and other submissions, however, do not include any affidavits or certifications based on personal knowledge describing the testimony of any putative alibi witnesses, demonstrating their testimony would have supported an alibi defense or establishing a reasonable probability that but for trial counsel's failure to interview or call them as witnesses, the result of defendant's trial would have been different.

The record is similarly devoid of any competent evidence establishing a reasonable probability that but for trial counsel's purported failure to investigate and call alibi witnesses the result of defendant's trial would have been different. Indeed, defendant does not provide any evidence concerning the testimony of any purported alibi witness his counsel failed to call at trial or establishing a reasonable probability the testimony would have changed the outcome of defendant's trial. A defendant may show prejudice by his trial counsel's failure to conduct an investigation where he or she presents evidence showing the testimony that would have been offered by an alibi witness would "have given rise to reasonable doubt about [the] defendant's guilt." Id. at 588. Defendant makes no such showing here. [FN4]

[FN 4] Contrary to defendant's conclusory assertions, the record shows trial counsel asserted an alibi defense and presented evidence supporting the defense through his cross-examination of the State's witnesses and presentation of defense witnesses and evidence detailing defendant's alleged movements and locations before, during and after Love's murder. Defendant presents no competent evidence showing that any investigation beyond that which supported counsel's presentation of the alibi defense at trial would have yielded witnesses or evidence further supporting the defense.

*Singer*, 2018 WL 5074171, at *5.

When assessing an ineffective assistance of counsel claim in the federal habeas context, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which "is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Grant*, 709 F.3d at 232 (quoting *Harrington*, 562 U.S. at 101). "A state court must be granted a deference and latitude that are not in operation when the case involves [direct] review under the *Strickland* standard itself." *Id.* Federal habeas review of ineffective assistance of counsel claims is thus "doubly deferential." *Id.* (quoting *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011)). Federal habeas courts must "take a highly deferential look at counsel's performance" under *Strickland*, "through the deferential lens of § 2254(d)." *Id.* (internal quotation marks and citations omitted).

The state courts properly articulated and applied the *Strickland* standard. The state courts' denial of this particular claim was not contrary to, nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts. In claiming that counsel was ineffective for failing to investigate, a petitioner must make a comprehensive showing as to what the investigation would have produced, that the evidence would have been

admissible, and how it would have changed the outcome of his proceeding to a reasonable probability. *See, e.g., Brown v. United States*, No. 13-2552, 2016 WL 1732377, at *5 (D.N.J. May 2, 2016) (citing *United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996)) (other citations omitted).  For the reasons stated by the Appellate Division, Petitioner fails to meet the threshold to bring a successful ineffective assistance of counsel claim for failure to investigate.  The one specific area in his federal habeas petition is that he asserts counsel should have investigated the crime scene.  However, Petitioner does not come forward with what evidence would have been discovered had counsel visited the crime scene that would have changed the outcome to a reasonable probability.  Accordingly, Claim VI is denied.

G.  Claim VII – Weight of the Evidence

In Claim VII, Petitioner argues that his conviction was against the weight of the evidence. The last reasoned decision on this claim was from the New Jersey Superior Court, Appellate Division during Petitioner's PCR proceedings which denied this claim as follows:

> Defendant also argues he is entitled to post-conviction relief because his conviction for conspiracy to commit murder is against the weight of the evidence.  We reject the argument because it could have been raised on direct appeal.  See State v. Goodwin, 173 N.J. 583, 593 (2002) (finding that under Rule 3:22-4, a defendant may not assert a claim in a PCR proceeding that could have been raised on direct appeal); see also State v. McQuaid, 147 N.J. 464, 483 (1997) (finding that PCR "is not used to challenge the sufficiency of evidence used to convict a defendant"); see also State v. Morales, 120 N.J. Super. 197, 200 (App. Div. 1972) (holding a "claim that the verdict was against the weight of the evidence can be raised only on a direct appeal; it is not a ground for post-conviction relief"). [FN 5]

>> [FN 5] Any argument that a verdict is against the weight of the evidence may not be raised on direct appeal unless the defendant first moved in the trial court for a new trial on that basis.  State v. Fierro, 438 N.J. Super. 517, 530 (App. Div. 2015) (citing R. 2:10-1).  Defendant's trial counsel made a motion for

a new trial and argued his conviction for conspiring to murder Love was against the weight of the evidence. The trial court denied the motion prior to defendant's sentencing.

In addition, defendant makes no showing that his assertion of the claim for the first time in his PCR petition falls within one of the exceptions under Rule 3:22-4(a). He does not argue or establish that the grounds for relief, the alleged lack of evidence supporting his conviction for conspiracy to commit murder, could not have been reasonably raised on direct appeal, R. 3:22-4(a)(1), or that denial of his request for relief would be contrary to a new rule of constitutional law, R. 3:22-4(a)(3).

Defendant also fails to demonstrate that enforcing the Rule 3:22-4 bar "would result in fundamental injustice." R. 3:22-4(a)(2). "To succeed on a fundamental-injustice claim, the [defendant] must make '"some showing"' that an error or violation '"played a role in the determination of guilt."'" Nash, 212 N.J. at 547 (citations omitted).

Defendant cannot establish that enforcement of the Rule 3:22-4 bar would result in a fundamental injustice because there was ample evidence supporting his conviction for conspiracy to commit murder. See N.J.S.A. 2C:5-2 and N.J.S.A. 2C:11-3. Defendant's claim his conviction was against the weight of the evidence is based on the premise that he could not logically be convicted of conspiracy to commit murder because the jury was unable to reach a verdict on the charges that he murdered Love and possessed a weapon for unlawful purposes. However, consistency of verdicts in a criminal case is not necessary because each charge in an indictment is considered separately, and "[a] jury verdict, even an inconsistent one, is upheld on appeal if the evidence is sufficient to establish guilt on the count of conviction." Fierro, 438 N.J. Super. at 528-29. Thus, any perceived inconsistency between the jury's inability to reach a verdict on the murder and gun possession charge and defendant's conviction for conspiracy to commit the murder is of no moment. In addition, the record supports the PCR court's determination there was evidence supporting the jury's determination defendant conspired with Miller to commit Love's murder, [FN 6] and defendant does not demonstrate otherwise. We therefore discern no basis to conclude that application of the Rule 3:22-4 bar to defendant's claim his conviction for conspiracy to commit Love's murder is against the weight of the evidence will result in a fundamental injustice.

[FN 6] The evidence included testimony establishing Miller requested that defendant come to the Ten's Enough club to provide Miller with "back up," defendant brought the handgun used to murder Love to the Ten's Enough club and was told by Miller to "take care" of Love immediately before Love was shot, defendant was identified by five eyewitnesses as being present when Love was shot, defendant fled the scene of the shooting with the handgun, and defendant admitted his involvement in Love's murder.

*Singer*, 2018 WL 5074171, at *6–7.

The New Jersey Superior Court, Appellate Division deemed this claim procedurally barred pursuant to New Jersey Court Rule 3:22-4[1] as the claim could have been raised on direct appeal.

---

[1] That rule states in part as follows:

(a) First Petition for Post-Conviction Relief. Any ground for relief not raised in the proceedings resulting in the conviction, or in a post-conviction proceeding brought and decided prior to the adoption of this rule, or in any appeal taken in any such proceedings is barred from assertion in a proceeding under this rule unless the court on motion or at the hearing finds:

(1) that the ground for relief not previously asserted could not reasonably have been raised in any prior proceeding; or
(2) that enforcement of the bar to preclude claims, including one for ineffective assistance of counsel, would result in fundamental injustice; or
(3) that denial of relief would be contrary to a new rule of constitutional law under either the Constitution of the United States or the State of New Jersey.

A ground could not reasonably have been raised in a prior proceeding only if defendant shows that the factual predicate for that ground could not have been discovered earlier through the exercise of reasonable diligence.

A denial of relief would be contrary to a new rule of constitutional law only if the defendant shows that the claim relies on a new rule

To the extent this claim *may* be procedurally defaulted in this federal habeas proceeding, this Court though can still deny it on the merits under 28 U.S.C. § 2254(b)(2). *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007). This Court elects to do so here for the reasons described *infra*.

While Plaintiff does not appear to make an express inconsistent verdict argument within this weight of the evidence claim, even if he did, it is well-established that a defendant, convicted by a jury on one count of the indictment, cannot attack that conviction because it is inconsistent with the jury's acquittal of another count. *See Dunn v. United States,* 284 U.S. 390, 393 (1932). So long as there is sufficient evidence to sustain the conviction for the charge of which the petitioner has been found guilty, a reviewing court will not disturb the conviction. *See id.*; *see also Davies v. Powell*, No. 19-12194, 2022 WL 1664535, at *17 (D.N.J. May 24, 2022).

Thus, a claim that the jury's verdict was against the weight of the evidence may raise a due process concern, only where, "after viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979). This standard must be applied "with explicit reference to the elements of the criminal offense as defined by state law." *Jackson,* 443 U.S. at 324, n. 16; *see also Orban v. Vaughn,* 123 F.3d 727 (3d Cir.1997). Furthermore, a state court factual determinations are presumed to be correct. *See Werts v. Vaughn,* 228 F.3d 178, 186 (3d Cir. 2000).

For similar reasons expressed by the New Jersey Superior Court, Appellate Division outlined above in determining that there was no fundamental injustice, this Court finds Petitioner's

---

of constitutional law, made retroactive to defendant's petition by the United States Supreme Court or the Supreme Court of New Jersey, that was unavailable during the pendency of any prior proceedings.

N.J. Ct. R. 3:22-4

conviction was consistent with the sufficiency of the evidence.  Therefore, Petitioner is not entitled

to federal habeas relief on Claim VII.

H.  Claim VIII – Ineffectiveness of Appellate Counsel for failing to raise argument on direct
    appeal that trial counsel failed to do an adequate investigation and failing to argue that the
    evidence was insufficient to convict

In Claim VIII, Petitioner argues that his appellate counsel was ineffective for failing to

raise the issues on direct appeal associated with Claims VI and VII.  The last reasoned decision on

this claim was from the New Jersey Superior Court, Appellate Division which denied this claim

during Petitioner's PCR proceedings as follows:

> We also reject defendant's contention the PCR court erred by
> denying his claim that his appellate counsel was ineffective.
> Defendant argues appellate counsel's performance was deficient
> because she failed to argue on direct appeal that trial counsel was
> ineffective by failing to conduct an adequate investigation and
> failing to call alibi witnesses.
>
> Defendant is entitled to the effective assistance of appellate counsel,
> but "appellate counsel does not have a constitutional duty to raise
> every nonfrivolous issue requested by the defendant."  State v.
> Morrison, 215 N.J. Super. 540, 549 (App. Div.) (citing Jones v.
> Barnes, 463 U.S. 745, 754 (1983)); see also State v. Gaither, 396
> N.J. Super. 508, 516 (App. Div. 2007) (holding that appellate
> counsel is not "required to advance every claim insisted upon by a
> client on appeal").  Defendant's appellate counsel's performance was
> not deficient by failing to argue that trial counsel failed to conduct
> an adequate investigation and call alibi witnesses because, as noted,
> those claims concerning trial counsel lack merit.  A criminal
> defendant's counsel is not ineffective by failing to raise a meritless
> legal argument on the defendant's behalf.  State v. Worlock, 117 N.J.
> 596, 625 (1990).
>
> Moreover, claims of ineffective assistance of trial counsel do not
> ordinarily find an appropriate remedy on direct appeal.  State v.
> Preciose, 129 N.J. 451, 460 (1992).  Thus, defendant's appellate
> counsel was not deficient by failing to argue on direct appeal that
> trial counsel was ineffective.  Under the circumstances presented
> here, appellate counsel properly reserved the claim for post-
> conviction relief.  See State v. Lewis, 389 N.J. Super. 409, 416 (App.

> Div. 2007) (finding "ineffective assistance of counsel claims are
> best left to post-conviction review").

*Singer*, 2018 WL 5074171, at *6.

"[C]laims of ineffective assistance of appellate counsel are also governed by the *Strickland* standard." *Lusick v. Palakovich*, 270 F. App'x 108, 110 (3d Cir. 2008) (citing *United States v. Mannino*, 212 F.3d 835, 840 (3d Cir. 2000)). While appellate counsel's decisions are subject to the same ineffective assistance standard applicable to trial counsel claims, *see Smith v. Robbins*, 528 U.S. 259, 285 (2000), "it is a well established principle . . . that counsel decides which issues to pursue on appeal," *Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996), and appellate counsel need not raise every nonfrivolous argument a defendant wishes to pursue. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983). As the chief component of effective appellate advocacy is the winnowing out of weaker claims in favor of those with a greater chance of success, *see id.* at 753; *see also Smith v. Murray*, 477 U.S. 527, 536 (1986), the United States Supreme Court has held that "[g]enerally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of [appellate] counsel be overcome." *See Robbins*, 528 U.S. at 288 (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).

Petitioner is not entitled to federal habeas relief on Claim VIII. As outlined *supra*, neither Claim VI nor Claim VII has merit. It thus follows that Petitioner fails to show to a reasonable probability that his direct appeal outcome would have been different had appellate counsel raised these two claims on his direct appeal. The New Jersey Superior Court, Appellate Division's denial of this claim was neither contrary to nor an unreasonable application of clearly established federal law, nor was the denial of this claim based on an unreasonable determination of the facts. Claim VIII is denied.

I.   Claim IX – Claims Raised in Petitioner's Pro Se PCR Petition

In Claim IX, Petitioner seeks to incorporate and raise by reference the claims he raised in his *pro se* PCR petition.  Those claims though are separately raised by Petitioner in this federal habeas petition in Claims X – XV.  They will each be analyzed and decided separately as described *infra*.  Accordingly, Claim IX is denied for the reasons discussed *infra*.

J.   Claim X – Ineffectiveness of Trial Counsel for Failing to Call as Witnesses: (1) Chibuzo Chukunia; (2) Ann Marie Pettigrew; (3) James Spurgeon; (4) Nicole Davis; and (5) Will Pitts

In Claim X, Petitioner argues that trial counsel erred in failing to call as witnesses: (1) Chibuzo Chukunia; (2) Ann Marie Pettigrew; (3) James Spurgeon; (4) Nicole Davis; and (5) Will Pitts.  Petitioner raised this claim in his *pro se* portion of his PCR petition.  (*See* ECF 18-52 at 14).

In the ineffective assistance of counsel context, "[p]rejudice 'requires more than just a 'conceivable' likelihood of a different result."  *Ali v. Nogan*, No. 13-7364, 2016 WL 8678443, at *7 (D.N.J. Apr. 1, 2016) (quoting *Grant v. Lockett*, 709 F.3d 224, 235 (3d Cir. 2013) (quoting *Harrington v. Richter*, 131 S. Ct. 770, 792 (2011))) (other citations omitted).  In *Duncan v. Morton*, 256 F.3d 189, 202, (3d Cir. 2001), the United States Court of Appeals for the Third Circuit found that a habeas petitioner's failure to present any sworn testimony by the witnesses the habeas petitioner claimed counsel should have investigated and called as witnesses amounts to a failure to establish *Strickland* prejudice. *See id.* ("In light of Duncan's failure to present any sworn testimony *by Sherman*, he has failed to establish prejudice as a result of [counsel's] failure to interview Sherman.") (emphasis added).

Petitioner has not come forward with any sworn statements by these five witnesses as to what their testimony would have been that would have changed the outcome of Petitioner's trial

to a reasonable probability.  This omission leads this Court to conclude that Petitioner cannot obtain federal habeas relief on this claim.  Claim X is denied.

K.  Claim XI – Prosecutorial Misconduct Regarding WaWa Surveillance Tape

Petitioner asserts in Claim XI that the prosecutor committed misconduct when he did not share with the defense a Wawa convenience store surveillance tape.  Plaintiff states that this tape should have been viewed by his counsel to help with Petitioner's alibi defense.  Plaintiff claims that when defense counsel requested a copy of the WaWa tape, he was told by the prosecutor's office that it was blank.  In addition to a purported prosecutorial misconduct claim, Petitioner also argues he was deprived his right to cross-examination and that his Confrontation Clause rights were violated by the prosecutor not providing his defense with a copy of the WaWa surveillance tape.

Petitioner raised this claim in his PCR proceedings.  The assistant district attorney ("ADA") argued that Petitioner's Confrontation Clause arguments were misplaced.  As to any purported discovery violation, the ADA noted in part that the tape was blank such that it could not be characterized as exculpatory evidence and that there was no evidence of bad faith on the part of the State.  (See ECF 18-53 at 36-37).

The New Jersey Superior Court, Law Division determined that the claim was procedurally barred pursuant to N.J. Court Rule 3:22-4(a) because Petitioner could have raised this issue on direct appeal.  (See ECF 18-54 at 37).  This was the last reasoned decision on this claim.

Even though the state courts found that this claim was procedurally barred, this Court can deny this claim on the merits if it is determined to not be a "colorable" claim  See, e.g., Giron v. Attorney General of New Jersey, No. 17-4048, 2020 WL 3169504, at *6 (D.N.J. June 15, 2020) (side-stepping procedural default issue on claim and analyzing claim on the merits to determine if

it is "colorable.").  For the following reasons, this claim is denied on the merits because it is not "colorable."

Petitioner raises Claim XI essentially as a claim essentially and in part brought pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).  A due process violation under *Brady* "occurs if: (1) the evidence at issue is favorable to the accused, because either it is exculpatory or impeaching; (2) the prosecution withheld it; and (3) the defendant was prejudiced because the evidence was 'material.'" *Breakiron v. Horn*, 642 F.3d 126, 133 (3d Cir. 2011) (citations omitted).  Materiality requires "a reasonable probability that, if the evidence had been disclosed, the result of the proceeding would have been different." *Id.* (citing *Giglio v. United States* 405 U.S. 150, 152 (1972)).  "'[T]he materiality standard for *Brady* claims is met when 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *United States v. Johnson*, 628 F. App'x 124, 129 (3d Cir. 2015) (quoting *Banks v. Dretke*, 540 U.S. 668, 698 (2004) (quoting *v. Whitley*, 514 U.S. 419, 435 (1995))).  The United States Supreme Court has stated the following:

> [T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith, *see Brady*, 373 U.S. at 87 . . . the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

*Kyles v. Whitley*, 514 U.S. 419, 437-48 (1995).  Thus, this indicates that there can be a *Brady* violation even if there was no bad faith on the part of the prosecution.  Indeed, courts have noted in the criminal context there is no intent requirement to bring a successful *Brady* claim.  *See Livingston v. Grewal*, No. 12-5450, 2018 WL 4251819, at *3 (D.N.J. Sept. 6, 2018) (noting were state conceded that it inadvertently suppressed evidence, that it met that part of the *Brady* test);

*Buckheit v. Dennis*, No. 09-5000, 2010 WL 3751889, at *12 (N.D. Cal. Sept. 24, 2010) ("In the criminal context, there is no intent requirement to establish a *Brady* claim; whether non-disclosure was negligent or by design, it is the responsibility of the prosecutor.") (internal quotation marks and citations omitted).

> As noted by the Third Circuit:

> > "The materiality of *Brady* depends almost entirely on the value of the evidence relative to the other evidence mustered by the state." *Rocha v. Thaler*, 619 F.3d 387, 396 (5th Cir. 2010) (internal quotation marks and citation omitted). Suppressed evidence that would be cumulative of other evidence or would be used to impeach testimony of a witness whose account is strongly corroborated is generally not considered material for *Brady* purposes. *Id.* at 396-97. Conversely, however, undisclosed evidence that would seriously undermine the testimony of a key witness may be considered material when it relates to an essential issue or the testimony lacks strong corroboration.

*Johnson v. Folino*, 705 F.3d 117, 129 (3d Cir. 2013). Additionally, inadmissible evidence can still be *Brady* material if it could lead to admissible evidence. *See Gibson v. Sec'y Pa. Dep't of Corr.*, 718 F. App'x 126, 131 (3d Cir. 2017) (citing *Dennis v. Sec'y Pa. Dep't of Corr.*, 834 F.3d 263, 309-10 (3d Cir. 2016) (en banc)). A petitioner has the burden of demonstrating how the disclosure of the evidence prior to his trial would have led to material exculpatory evidence. *See DeCologero v. United States*, 802 F.3d 155, 164 (1st Cir. 2015).

> Petitioner fails to show that the WaWa surveillance tape was material. Indeed, he provides nothing to counter the statement that the surveillance tape was blank. Further, he fails to show how, had this blank tape been provided to the defense, it would have led to possible material exculpatory evidence. Instead, his argument that the WaWa tape was exculpatory is merely speculative. *See Bell v. Napoli*, No. 08-9900, 2010 WL 8039333, at *21 (S.D.N.Y. Aug. 24, 2010) (noting that petitioner did not and cannot demonstrate that surveillance tape contained exculpatory

or impeaching evidence to constitute a *Brady* violation because petitioner having never seen the tape means that his assertion as to what was on the tape amounts to mere speculation); *report and recommendation adopted by*, 2011 WL 6097729 (S.D.N.Y. Dec. 7, 2011); *see also United States v. Mitrovich*, 547 F. Supp. 3d 833, 839 (N.D. Ill. 2021) (citing *United States v. Morris*, 957 F.2d 1391, 1403 (7th Cir. 1992) (quoting *United States v. Navarro*, 737 F.2d 625, 631 (7th Cir. 1984))) ("It is the defendant's burden to offer more than mere speculation that the undisclosed evidence in question is exculpatory and material."); *Smith v. Davis*, No. 20-668, 2020 WL 2857950, at *5 (N.D. Tex. Apr. 20, 2020) (noting that a petitioner's unsubstantiated suspicion that exculpatory evidence was withheld is not enough to state a plausible constitutional claim), *report and recommendation adopted by*, 2020 WL 2857501 (N.D. Tex. May 29, 2020). Accordingly, to the extent Petitioner relies on *Brady* to support his argument within Claim XI, Petitioner's challenge lack merit.

As noted above, Petitioner also cites to the Confrontation Clause to support his argument within Claim XI. The Confrontation Clause of the Sixth Amendment states that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "The Fourteenth Amendment renders the [Confrontation] Clause binding on the States." *Michigan v. Bryant,* 562 U.S. 344, 352 (2011) (citing *Pointer v. Texas*, 380 U.S. 400, 403 (1965)). Pursuant to the Confrontation Clause, "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington,* 541 U.S. 36, 59 (2004) (footnote omitted). "As to the second requirement, the Confrontation Clause requires that a defendant have had 'a full and fair opportunity to probe and expose [testimonial] infirmities' of an unavailable government witness in order for that witness's prior testimony to be

admissible." *Ross v. Dist. Attorney of Cty. of Allegheny,* 672 F.3d 198, 206–07 (3d Cir. 2012)

(citing *United States v. Owens,* 484 U.S. 554, 558 (1988) (quoting *Delaware v. Fensterer,* 474

U.S. 15 (1985))).  The Confrontation Clause applies to testimonial hearsay that is admitted to

establish the truth of the matter asserted. *See Crawford,* 541 U.S. at 59 n.9 ("The [Confrontation]

Clause also does not bar the use of testimonial statements for purposes other than establishing the

truth of the matter asserted.") (citation omitted).  "[S]tatements made under circumstances that

would lead an objective witness reasonably to believe that the statement would be available for

use at a later trial are testimonial." *United States v. Hinton,* 423 F.3d 355, 360 (3d Cir. 2005).

In this case, as noted by the ADA during the PCR proceedings, the blank surveillance tape

was not "testimonial" evidence.  Accordingly, Petitioner is not entitled to federal habeas relief on

any of his arguments within Claim XI.

L. Claim XII – Grand Jury Indictment Failed to Allege Essential Elements of the Charged
   Criminal Wrongs

In Claim XII, Petitioner first argues that including more than one crime in his indictment

was unconstitutional.[2]  More specifically, Petitioner complains about being charged with three

separate counts of witness retaliation in Counts 4-6 of the second indictment when he was also

charged with three counts of conspiracy to murder these witnesses. (*See* ECF 9 at 31-32).  Second,

Petitioner argues that not all the allegations in the indictment were established.

The last reasoned decision on this claim was from the New Jersey Superior Court, Law

Division, which found this claim procedurally barred pursuant to N.J. Court Rule 3:22-4(a)

because Petitioner could have, but failed to raise this issue on direct appeal.  (*See* ECF 18-54 at

---

[2] Petitioner cites to both the federal and New Jersey's state constitution to support this claim.
However, in this federal habeas context, "[a] claim for violation of the New Jersey Constitution is
not a cognizable habeas claim." *See Rosa v. Slaughter,* No. 20-4686, 2023 WL 2754707, at *36
(D.N.J. Mar. 31, 2023) (citing *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991)).

37). This Court will not determine this claim on procedural grounds.  Instead, the claim will be denied on the merits because it is not "colorable."

"A multiplicitous indictment charges the same offense in two or more counts and may lead to multiple sentences for a single violation, a result prohibited by the Double Jeopardy Clause" of the Fifth Amendment to the United States Constitution. *See United States v. Pollen*, 978 F.2d 78, 83 (3d Cir. 1992). "Importantly, the Double Jeopardy Clause prohibits repeat trials [or prosecutions] for the same offense, not for the same conduct. Accordingly, a defendant may be subject to multiple prosecutions for the same conduct if Congress intended to impose multiple punishments for that conduct. . . . In other words, a defendant generally may be subject to multiple prosecutions so long as each prosecution involves a difference offense." *United States v. Rigas*, 605 F.3d 194, 204 (3d Cir. 2010) (citing *Albernaz v. United States*, 450 U.S. 333 (1981)).  In *Blockburger v. United States*, the Supreme Court held that, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires a proof of a fact which the other does not." *Id.* (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). "Also of central importance is whether the legislature intended to make separately punishable the different types of conduct referred to in the various counts." *United States v. Stanfa*, 685 F.2d 85, 86-87 (3d Cir. 1982).

"While the Double Jeopardy Clause may protect a defendant against cumulative punishments for convictions on the same offense, the Clause does not prohibit the State from prosecuting [a defendant] for multiple offenses in a single prosecution." *Ohio v. Johnson*, 467 U.S. 493, 500 (1984).  Additionally, any error regarding a multiplicitous indictment is merger of the multiplicitous counts into a single count. *See Johnson v. Wilson*, No. 10-178, 2018 WL

5300203, at *24 (D.D.C. Apr. 11, 2018) (citing *Ball v. United States*, 470 U.S. 856, 864-65 (1985); *United States v. McCafferty*, 482 F. App'x 117, 126 (6th Cir. 2012); *United States v. Platter*, 514 F.3d 7 (8th Cir. 2008); *United States v. Dudley*, 581 F.2d 1193, 1199 (5th Cir. 1978)), *report and recommendation adopted by* 2018 WL 5297811 (D.D.C. Oct. 25, 2018), *aff'd by*, 960 F.3d 648 (D.C. Cir. 2020).

Even if there was some purported multiplicitous error with the indictment as Petitioner alleges, Counts 4-6 were merged with Counts 1-3 at Petitioner's sentencing. (*See* ECF 18-41 at 50). Given this merger, Petitioner fails to show that he is entitled to federal habeas relief on his multiplicitous indictment argument.

Also within Claim XII, Petitioner argues that the indictment needed to be dismissed because the allegations of Counts 4-6 of the second indictment needed to be proved at a hearing. (*See* ECF 9 at 32). Petitioner fails to show that he is entitled to federal habeas relief on this portion of Claim XII. Indeed, Petitioner was found guilty on Counts 4-6 following a trial by a jury of his peers. Therefore, Claim XII is therefore denied.

M. <u>Claim XIII – Trial Counsel Ineffective for Failing to Oppose Consolidation and Failing to Move for Severance</u>

In Claim XIII, Petitioner asserts that trial counsel was ineffective for failing to move for severance and/or oppose the State's consolidation request. Petitioner's claim relates to the joining of his murder/conspiracy to murder Love charges with his charges for conspiracy to murder witnesses/witness intimidation.

For purposes of habeas review, joinder of offenses rises to the level of a constitutional violation only if it renders the state trial fundamentally unfair. *See United States. v. Lane*, 474 U.S. 438, 446 n.8 (1986) ("[M]isjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial.")

Although there is always a danger of prejudicial effect when several crimes are tried together, the United States Supreme Court has held that this effect is justified on the grounds that the jury is expected to follow instructions with regard to evidence, and because "the convenience of trying different crimes against the same person . . . in the same trial is a valid governmental interest." *Spencer v. Texas*, 385 U.S. 554, 562 (1967).

> The argument against joinder of offenses is that a defendant may be prejudiced by the possibility that the jury may use the evidence of one of the crimes charged to infer a criminal disposition; or the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find. Notwithstanding, to succeed on a claim of unconstitutional joinder, a petitioner must show that actual prejudice resulted from the events as they unfolded during the joint trial.

*Foy v. Lamas*, No. 12-88, 2013 WL 838191, at *13 (W.D. Pa. Mar. 6, 2012) (citing *Tribbitt v. Wainwright*, 540 F.2d 840, 841 (2d Cir. 1976); *United States v. Walker* 657 F.3d 160, 170 (3d Cir. 2011) *United States v. Lore*, 430 F.3d 190, 205 (3d Cir. 2005)).  Without actual prejudice, a trial of more than one offense does not render in and of itself a trial fundamentally unfair.  *See id.*

A petitioner has the burden to show prejudice from joinder; indeed, he must demonstrate that joinder will result in a "'manifestly unfair trial, beyond a mere showing that he would have had a better chance of acquittal with separate trials.'"  *See id.* (quoting *Gov't of Virgin Islands v. Sanes*, 57 F.3d 338, 341–342 (3d Cir. 1995)).  The following factors are analyzed in determined whether a petitioner has been prejudiced by purported improper joinder of charges at trial: "1) whether the presentation of separate counts with distinct and extensive evidence confused the jury, 2) whether the charging of several crimes made the jury hostile, and 3) whether the jury was able to segregate the evidence as to each count."  *See id.* (citing *United States v. Torres*, 251 F. App'x 763, 764 (3d Cir. 2007)).  It is of primary importance to examine whether "the jury can reasonably be expected to compartmentalize the evidence as it relates to each count by following the

instructions of the trial court. *See id.* (citing *United States v. Reicherter,* 647 F.2d 397, 400 (3d Cir. 1981); *Burnett v. Collins,* 982 F.2d 922, 929 (5th Cir. 1993); *Breeland v. Blackburn,* 786 F.2d 1239, 1240 (5th Cir. 1986) *Tribbitt,* 540 F.2d at 841)).

This Court finds that Petitioner is not entitled to federal habeas relief on this ineffective assistance of counsel claim. Petitioner fails to show he was prejudiced by the joinder of his murder/conspiracy to murder Love claims along with his witness intimidation claims. The trial judge meticulously went through each charged count individually noting what the prosecution needed to prove for each. (*See* ECF 18-33 at 30-43). The jury is presumed to have followed the trial judge's instructions. *See United States v. Delgado*, 827 F. App'x 180, 183 (3d Cir. 2020) (citing *Weeks v. Angelone*, 528 U.S. 225, 234 (2000)).

Furthermore, this jury was clearly able to compartmentalize the different charges against Petitioner. This is particularly shown given they were unable to reach a unanimous verdict on whether Petitioner was guilty of murder of Love and possession of a firearm. *Cf. United States v. Cuozzo*, 962 F.2d 945, 950 (9th Cir. 1992) ("The fact that the jury rendered selective verdicts is highly indicative of its ability to compartmentalize the evidence."). For these reasons, Petitioner fails to show he is entitled to federal habeas relief on Claim XIII.

N. Claim XIV - Ineffective Assistance of Appellate Counsel for (1) Not Pursuing Trial Counsel's Ineffectiveness for a Mistrial due to Jury Deadlock; and (2) Failing to Raise Prosecution's Submission of a Letter Without Authentication

In Claim XIV, Petitioner argues that appellate counsel was ineffective for failing to raise on appeal trial counsel's failure to seek a mistrial due to jury deadlock. Petitioner also argues within Claim XIV that appellate counsel should have raised an issue on appeal that the prosecutor submitted a letter without getting it authenticated.

With respect to the letter issue, Petitioner gives no indication in his amended habeas petition as to what letter he is referring to, the content of the letter, or how he suffered *Strickland* prejudice because of its admission besides bald accusations as to its purported prejudice; namely had counsel objected to its admissibility, the result of Petitioner's trial would have been different to a reasonable probability. Given Petitioner failed to provide information to the Court related to this letter, and the sufficiency of the evidence that was produced against Petitioner during his trial, Petitioner is not entitled to federal habeas relief on this portion of Claim XIV.

With respect to Petitioner's claim that counsel was ineffective for failing to request a mistrial due to jury deadlock, Petitioner is also not entitled to federal habeas relief. The jury began its deliberations the afternoon of November 30, 2011. (*See* ECF 18-33). It then continued its deliberations the next day, December 1, 2011, during which it requested that Aisha Williams' testimony be read back to them which that court granted. (*See* ECF 18-34). The jury then returned to deliberate on December 5, 2011. (*See* ECF 18-35). At approximately 3:00 p.m. on December 5, 2011, the jury sent the trial judge a note indicating deadlock. (*See* ECF 18-35 at 18). After consulting with counsel, the trial judge then gave the jury the following charge at 3:22 p.m.:

> Ladies and gentlemen, I have your note which I have marked as Court's exhibit 13. It reads as follows: Dear Judge, we the jury wish to express to you at this time we are unable to come to a unanimous decision as to a guilty or not guilty verdict. On each end of the spectrum, there is strong, nonmovable commitment. This has led us to so conclude that no matter how much deliberation we perform, we will be unable to bring you a verdict. The jury. Close quote.
>
> Ladies and gentlemen. I appreciate that advice, and I respect the sentiment attached to it. I am required, however, to give you the following instruction in just such circumstances.
>
> It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the case

for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.

In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous, but do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. You are not partisans. You are judges, judges of the facts.

Now, ladies and gentlemen, it is, with respect to each of you individually and to you as a deliberating body, it is my obligation to ask you, having given you that supplemental instruction, to resume your deliberations. I am going to ask you to do the first thing in the morning. It is now 3:24. We have little time left in the court day, and I do not want the press of that time to influence your deliberations or decision at this juncture.

I'm going to ask you to resume your deliberations at that time, and we will abide your further advice in the matter.

(ECF 18-35 at 19-20).

The jury then returned to its deliberations the next day, December 6, 2011, and asked to rehear the testimony of Mr. Blunt and Mr. Rice, whose testimony was then read back. (*See* ECF 18-36 at 2-9). Later that afternoon, the jury requested a read back of Detective Whipple and Mr. Hofgesang's testimony as it related to the times it took them to drive to Ten's Enough, Highland Park and BP. (*See* ECF 18-36 at 13). That relevant testimony was then read back to the jury. (*See id.* at 19-20).

The jury returned to deliberate on December 7, 2011. (*See* ECF 18-37). The jury requested a readback of Kendrick's direct testimony about the events of May 10, 2008, specifically what transpired at Ten's Enough. (*See id.* at 3). The court reporter then read back the relevant portions of Kendrick's testimony related to the jury's note. (*See id.* at 12-13).

Thereafter, the jury sent another note which indicated that they had reached a verdict on seven of the nine counts, but could not come to a unanimous verdict on two counts. (*See id.* at 7-

8).  Defense counsel then asked for a mistrial on "everything."  (*See id.* at 8).  The trial judge then denied the request for a mistrial on "everything."  (*See id.* at 12).  The jury was then brought back into the courtroom.  The trial judge inquired whether the jury could reach a decision on the remaining two counts to a reasonable probability.  (*See id.* at 14-15).  The jury said there was no reasonable probability it could reach a verdict on the remaining two counts.  (*See id.* at 15).  The court received the partial verdict whereupon Petitioner was found guilty on all counts but the jury was deadlocked on the count against Petitioner for the murder of Love and for the count related to Petitioner's possession of a weapon with a purpose to use it unlawfully against a person of another. (*See id.* at 16-17).

Given that Petitioner's trial counsel *did* request a mistrial when the jury came back noting it was deadlocked on two counts, Petitioner's argument within this claim must relate to counsel's purported failure to request a mistrial when the jury came back noting it was deadlocked on these two counts.  This Court finds that Petitioner's trial counsel did not fall below an objective standard of reasonableness at that time for failing to request a mistrial.  *Cf. United States v. Burke*, 257 F.3d 1321, 1324 (11th Cir. 2001) (decision to request a mistrial is a tactical decision); *see also United States v. Allick*, 386 F. App'x 100, 104-05 (3d Cir. 2010).  Indeed, the trial judge subsequently charged the jury to continue its deliberations despite its apparent deadlock.  The jury's note was also during the early stages of the jury's deliberations.  After instructions to continue with its deliberations by the trial judge, the jury then resumed its deliberations in earnest for several more days, ultimately finding Petitioner guilty of several charges, but remaining deadlocked on others. For these reasons, Petitioner is not entitled to federal habeas relief on Claim XIV.

O.  Claim XV – Extended Term must be Reversed

In Claim XV, Petitioner argues that sentencing him to an extended term must be reversed because the trial judge impermissibly used municipal charges in sentencing him.  (*See* ECF 9 at 34).  He further asserts within this claim that aggravating factor nine (the need to deter Petitioner and others from violating the law) was not properly expounded upon by the trial judge in imposing his sentence.  (*See id.*)

Petitioner raised this claim during his PCR proceedings.  The New Jersey Superior Court, Law Division determined that this claim was procedurally barred pursuant to N.J. Court Rule 3:22-4(a) because it should have been raised on direct appeal.  Nevertheless, as previously explained, this Court can, and will deny this claim on the merits even if it is procedurally defaulted, because it is not "colorable."

To the extent that this claim raises issues of state law, Petitioner is not entitled to federal habeas relief.  Indeed, "a federal court's ability to review state sentences is limited to challenges based upon proscribed federal grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by indigencies.'" *Merritt v. Bartkowski*, No. 11–3756, 2013 WL 4588722, at *15 (D.N.J. Aug. 28, 2013) (quoting *Grecco v. O'Lone*, 661 F. Supp. 408, 415 (D.N.J. 1987) (citation omitted)).  Thus, a challenge to a state court's discretion at sentencing is not reviewable in a federal habeas proceeding unless it violates a separate federal constitutional limitation.  *See Pringle v. Court of Common Pleas*, 744 F.2d 297, 300 (3d Cir. 1984); *see also* 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  As such, Petitioner's challenges to his sentencing "for failure to properly weigh the aggravating and mitigating factors [are] not reviewable here." *See Jenkins v. Bartkowski*, No. 10-4972, 2014 WL 2602177, at *21 (D.N.J. June 11, 2014).  Furthermore, to the extent that this Claim raises federal constitutional challenges, this Court has

already determined that Petitioner's sentence did not violate the Eighth Amendment as discussed

in analyzing Claim IV.  Finally, this Court notes that Petitioner is factually incorrect that the state

court used municipal charges to enhance his sentence.  (*See* Judgment of Conviction, ECF 18-51

at 44 (detailing the charges used to enhance Petitioner's sentence).  Accordingly, Petitioner is not

entitled to federal habeas relief in Claim XV.

P.  Claim XVI – Ineffective Assistance of Appellate Counsel for Failing to Investigate and
Present an Alibi Defense

In Claim XVI, Petitioner argues that appellate counsel was ineffective for failing to argue

that trial counsel was ineffective for failing to investigate and present an adequate alibi defense.

The last reasoned decision on this claim was from the New Jersey Superior Court, Appellate

Division during Petitioner's PCR proceedings which analyzed this claim as follows:

> We also reject defendant's contention the PCR court erred by
> denying his claim that his appellate counsel was ineffective.
> Defendant argues appellate counsel's performance was deficient
> because she failed to argue on direct appeal that trial counsel was
> ineffective by failing to conduct an adequate investigation and
> failing to call alibi witnesses.
>
> Defendant is entitled to the effective assistance of appellate counsel,
> but "appellate counsel does not have a constitutional duty to raise
> every nonfrivolous issue requested by the defendant." State v.
> Morrison, 215 N.J. Super. 540, 549 (App. Div.) (citing Jones v.
> Barnes, 463 U.S. 745, 754 (1983) ); see also State v. Gaither, 396
> N.J. Super. 508, 516 (App. Div. 2007) (holding that appellate
> counsel is not "required to advance every claim insisted upon by a
> client on appeal"). Defendant's appellate counsel's performance was
> not deficient by failing to argue that trial counsel failed to conduct
> an adequate investigation and call alibi witnesses because, as noted,
> those claims concerning trial counsel lack merit. A criminal
> defendant's counsel is not ineffective by failing to raise a meritless
> legal argument on the defendant's behalf. State v. Worlock, 117 N.J.
> 596, 625 (1990).
>
> Moreover, claims of ineffective assistance of trial counsel do not
> ordinarily find an appropriate remedy on direct appeal. State v.
> Precise, 129 N.J. 451, 460 (1992). Thus, defendant's appellate

> counsel was not deficient by failing to argue on direct appeal that
> trial counsel was ineffective. Under the circumstances presented
> here, appellate counsel properly reserved the claim for post-
> conviction relief. See State v. Lewis, 389 N.J. Super. 409, 416 (App.
> Div. 2007) (finding "ineffective assistance of counsel claims are
> best left to post-conviction review").

*Singer*, 2018 WL 5074171, at *6.

The New Jersey Superior Court, Appellate Division's denial of this claim was not contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts. Indeed, this Court previously outlined the failures associated with Petitioner's claims related to his argument that trial counsel was ineffective for failing to investigate and prepare an adequate alibi defense as described *supra*. It thus follows that appellate counsel was not ineffective for failing to raise meritless claims. Furthermore, as noted by the Appellate Division, any ineffective assistance of counsel claim would have been more properly brought during Petitioner's PCR proceedings, as opposed to by appellate counsel on direct appeal. Accordingly, Petitioner is not entitled to federal habeas relief on Claim XVI.

Q. Claim XVII – Conviction for Conspiracy to Commit Murder was Against the Weight of the Evidence

In Claim XVII, Petitioner again argues that his conviction for conspiracy to commit murder was against the weight of the evidence. Petitioner raised a similar claim in Claim VII, which this Court has denied set forth *supra*. Therefore, Claim XVII is similarly denied.

R. Claim XVIII – Trial Counsel Ineffective for Failing to Move to Dismiss the Indictment

In Claim XVIII, Petitioner argues that trial counsel was ineffective for failing to move to dismiss the indictment related to the conspiracy to murder witnesses/witness intimidation. However, Petitioner fails to show that he is entitled to federal habeas relief on this claim as he was eventually found guilty on the charges in the indictment related to witnesses by a jury at trial. *See*

*Lopez v. Riley,* 865 F.2d 30, 32 (2d Cir. 1989) (citing *United States v. Mechanik,* 475 U.S. 66, 70 (1986)) (deficiencies in state grand jury proceedings are not cognizable on habeas review because a "subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt") *see also Lovern v. United States*, 689 F. Supp. 569, 592 (E.D. Va. 1988) ("Because the jury's guilty verdict erases any deficiencies in the grand jury proceedings, defense counsel's failure to move to quash the indictment is harmless error."). Accordingly, Petitioner is not entitled to federal habeas relief on Claim XVIII.

S. <u>Claim XIX – Ineffectiveness of Appellate and PCR Counsel led Petitioner to be Unable to Prove his Actual Innocence</u>

In Claim XIX, Petitioner argues appellate and PCR counsel were ineffective because there was insufficient evidence for his convictions. Initially, Petitioner is not entitled to federal habeas relief on a standalone claim that PCR counsel was ineffective. Indeed, 28 U.S.C. § 2254(i) precludes claims for ineffective assistance of PCR counsel. *See Martinez v. Ryan*, 566 U.S. 1, 17 (2012) (while ineffective assistance on initial collateral review proceedings may be grounds for excusing procedural default, it is not the basis for an independent constitutional claim). Additionally, this Court has already discussed Petitioner's claims related to the weight of the evidence against him and found they lack merit. It thus follows that Petitioner fails to show *Strickland* prejudice as to any deficiency related to appellate counsel's purported ineffectiveness for failing to raise meritless claims on appeal. Petitioner is not entitled to federal habeas relief on Claim XIX.

T. <u>Claim XX – Right of Public to Witness a Fair Trial</u>

While Petitioner asserts in Claim XX that the right of a New Jersey citizen to witness a public trial was infringed, this claim really reiterates (albeit in slightly different terms), what has

already been analyzed and denied in Claim II regarding Petitioner's challenge to the trial judge's decision not to suppress Williams' identification due to a purportedly impermissible photo array. Petitioner raised this claim in his PCR proceedings. (*See* ECF 18-55 at 14-15). The New Jersey Superior Court, Appellate Division summarily denied this claim. *See Singer*, 2018 WL 5074171, at *7. This Court has already determined that Petitioner is not entitled to federal habeas relief on that claim. Accordingly, Claim XX is also denied.[3]

U. Claim XXI – Prosecutorial Misconduct for Using Perjured Testimony From Miller

Petitioner argues in Claim XXI that the prosecutor committed misconduct by using the perjured testimony from Miller. (*See* ECF 9 at 38-39). More specifically, Petitioner states that Miller took a plea deal for conspiracy to commit an assault and that he testified he did not know the victim would be killed. Petitioner states that the prosecutor committed misconduct by knowing that the plea deal was a reward for giving false testimony. This issue was raised by Petitioner during his PCR proceedings. (*See* ECF 18-55 at 16-17). The New Jersey Superior Court, Appellate Division summarily denied this claim. For the following reasons, Petitioner is not entitled to federal habeas relief on this Claim.[4]

A habeas claim based on prosecutorial misconduct should be granted only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks and

---

[3] In summarily denying this and several other claims raised by Petitioner, the New Jersey Superior Court, Appellate Division held that the claim did not warrant discussion in a written opinion. *See Singer*, 2017 WL 5074171, at *7. However, in so doing, the Appellate Division also cited to N.J. Court Rule 3:22-4 for Petitioner's failure to raise it on direct appeal. Even if this claim was found to be procedurally barred by the state courts, this claim can and will be denied on the merits as it is not "colorable."

[4] Like Claim XX, even if this Court applies the more generous "colorable" standard as opposed to AEDPA deference, Petitioner is not entitled to federal habeas relief for the reasons described *infra*.

citation omitted); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). A prosecutorial misconduct claim is examined in "light of the record as a whole" in order to determine whether the conduct "had a substantial and injurious effect or influence" on the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993). Likewise, a "reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001).

The prosecution's knowing use of perjured testimony violates the Fourteenth Amendment. *See Giglio v. United States*, 405 U.S. 150, 153 (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (1959). "Perjury is the willful, knowing and corrupt giving, under oath, of false testimony material to the issue or point of inquiry." *United States v. Rose*, 215 F.2d 617, 622–23 (3d Cir. 1954). When false testimony is presented, a conviction must be vacated "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Biberfeld*, 957 F.2d 98, 102 (3d Cir. 1992). Thus, a habeas petitioner must "show that (1) [the witness] committed perjury; (2) the government knew or should have known of his perjury; (3) the testimony went uncorrected; and (4) there is any reasonable likelihood that the false testimony could have affected the verdict." *Lambert v. Blackwell*, 387 F.3d 210, 242 (3d Cir. 2004).

Petitioner is not entitled to federal habeas relief on this claim. This Court has reviewed the entirety of Miller's testimony at trial. It appears as if Plaintiff is alleging that Miller perjured himself when he testified that he did not know Love would be killed when he told Petitioner to "take care" of Love, whereas Petitioner was convicted of conspiracy to murder. This Court though fails to see how Miller's testimony was perjury, or perhaps more importantly, that the prosecutor knew that such testimony was perjury.

During direct examination, Miller noted that he was initially charged with murder and conspiracy to commit murder.  (*See* ECF 18-23 at 47).  However, after entering a plea with the State, Miller's charges were downgraded to conspiracy to commit assault.  (*See id.*).  This Court fails to see how the fact that the State agreed to a downgraded charge of conspiracy to commit assault with respect to Miller's actions warrants a finding that Miller perjured himself and/or that the government knew that Miller was committing perjury.  Furthermore, it is worth noting that at one point on direct Miller testified that when he told Petitioner to go after Love, he thought it just meant to "fight."  (*See id.* at 62).  Miller's testimony went to the weight of the evidence against Petitioner, did not amount to perjury, and certainly there is no indication that the State knew that Miller was committing perjury.  Claim XXI is therefore denied.

### V.  Claim XXII – Prosecutorial Misconduct – Knowing Use of Kendrick's Perjured Testimony

In Claim XXII, Petitioner asserts that the prosecutor knowingly used perjured testimony from Kendrick. More specifically, Petitioner states that Kendrick testified that he knew of no plan to kill Love.  (*See* ECF 9 at 39).  Nevertheless, he was still allowed to plead guilty to conspiracy to commit murder against Love.  (*See id.*).  In exchange for pleading guilty, Kendrick received a ten-year as opposed to a forty-year sentence.  (*See id.*).  Petitioner also states that the jury was confused by the trial judge's cautionary instruction after Kendrick stated on the stand, "I'm not really guilty under the law of conspiracy to commit murder, but I pled guilty to conspiracy to commit murder."  Finally, Petitioner again re-raises his complaints with the sufficiency of the underlying indictments against him.  (*See id.* at 40).

Petitioner raised portions of this Claim during his PCR proceedings. The New Jersey Superior Court, Appellate Division summarily denied this claim without discussion. For the following reasons, Petitioner is not entitled to federal habeas relief on this Claim.[5]

For similar reasons as discussed with Claim XXI, this Court fails to find perjured statements and/or that the government knew that Kendrick was committing perjury during his testimony to the extent raised by Petitioner in his amended habeas petition. Again, Petitioner's assertions in Claim XXII appear to relate to the fact that he was convicted of conspiracy to commit murder, but Kendrick testified that he did not know of the agreement between him and Petitioner to do so. Such evidence presumably goes to the *sufficiency* of the evidence against Petitioner at his state criminal trial, but does not amount to perjury, and certainly does not show that the State knew or should have known that Kendrick was committing perjury by making such statements. Furthermore, Petitioner has failed to show how the purportedly false statements affected the verdict to a reasonable likelihood.[6]

Petitioner also alludes to a purportedly improper limiting instruction that the trial judge gave to the jury when Kendrick testified at Petitioner's trial about his plea deal with the government. Petitioner has not identified expressly what was prejudicial about the instructions given by the trial judge about Kendrick's s plea, nor has this Court identified prejudice towards Petitioner during the course of Kendrick's testimony on this issue at trial.

---

[5] Petitioner is not entitled to federal habeas relief in this claim applying either AEDPA deference or a "colorable" standard.

[6] At one point during cross-examination, Kendrick corrected his testimony on direct when he had previously stated that he had not talked to the prosecutor before trial. (*See* ECF 18-14 at 12-13). However, this error was corrected on cross-examination by Kendrick. This Court fails to see how Kendrick's misstatements during direct examination =would impact the verdict against Petitioner to a reasonable likelihood.

Finally, to the extent Petitioner re-raises arguments related to the indictment in Claim XXII, they are without merit as discussed *supra*.

Accordingly, Petitioner is not entitled to federal habeas relief in Claim XXII.

W. Claim XXIII – Weight of the Evidence

In Claim XXIII, Petitioner again reiterates his weight/sufficiency of the evidence arguments. However, this Court has already determined that Petitioner is not entitled to federal habeas relief on such a habeas claim. Claim XIII is therefore denied.

X. Claim XXIV – Judge was not Impartial

While Petitioner titles Claim XXIV as one in which he challenges the trial judge's impartiality, the arguments asserted by Petitioner in this claim are very different. First, Plaintiff again asserts a weight of the evidence argument, which this Court has already discussed and addressed *surpa* and need not do so again here.

Next, Petitioner claims that the prosecutor purportedly bolstered the credibility of Kendrick and Miller when it was apparent from the testimony that Kendrick was the last person to have possession of the murder weapon. To the extent Petitioner claims that the prosecutor improperly vouched for the witness's credibility, the Court notes that "[v]ouching is a type of prosecutorial misconduct." *Lam v. Kelchner*, 304 F.3d 256, 271 (3d Cir. 2002). Vouching occurs if the following two criteria are met: (1) the prosecution "assure[s] the jury that the testimony of a Government witness is credible," and (2) the assurance is "based on either the prosecutor's personal knowledge or other information that is not before the jury." *Id.* "Unless it affect[ed] [the] fundamental fairness of the trial," "vouching does not rise to the level of a federal due process violation." *Id.* As such, "habeas relief is not available simply because the prosecutor's remarks were undesirable or even universally condemned." *Id.*

This Court has reviewed the entirety of Kendrick's testimony as well as the prosecutor's opening and closing statements. There was no unconstitutional vouching for Kendrick's testimony in this case. Furthermore, and importantly, the trial judge expressly instructed the jury in this case that counsel's arguments are not evidence. (*See* ECF 18-33 at 19). The jury is presumed to have followed the trial judge's instructions on this point. *See Delgado*, 827 F. App'x at 183 (citing *Weeks*, 528 U.S. at 234).

Finally, Petitioner again complains about the evidence the prosecutor submitted to the grand jury to obtain indictments. However, as noted above, Petitioner was eventually tried and convicted by a jury of his peers. His claims related to the evidence presented to the grand jury lack merit.

For these reasons, Claim XXIV is denied.

## V.    CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Applying this standard, this Court finds that a certificate of appealability shall not issue in this case.

## VI.    CONCLUSION

For the foregoing reasons, Petitioner's amended habeas petition is denied.  A certificate of appealability shall not issue.  An appropriate order will be entered.

DATED:  September 28, 2023

_____
GEORGETTE CASTNER
United States District Judge